**SUMMIT CONTRACTORS, Plaintiff,**

**Insurance Company of North America, Third Party Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 178–85C.**

United States Claims Court.

Nov. 8, 1990.

Jonathan M. Hoffman, Portland, Or., Atty. of Record, for plaintiff. Martin, Bischoff, Templeton, Ericsson & Langslet, of counsel.

Teresa L. Polk, San Francisco, Cal., Atty. of Record, for third party plaintiff. Adams, Philipps & Alexander, of counsel.

E. Kathleen Shahan, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. David Cohen, Director, Thomas W. Petersen, Asst. Director, and William P. McGinnies, Dept. of Agriculture, Washington, D.C., of counsel.

## OPINION

FUTEY, Judge.

This government contract case is before the court on defendant's motion for sum-

mary judgment and third party plaintiff's cross-motion for summary judgment. Third party plaintiff, together with plaintiff, seek a determination from the court that plaintiff was not in default of its timber sale contract, and that defendant's assessment of damages against plaintiff was, therefore, erroneous. Defendant seeks recovery from plaintiff and third party plaintiff for damages incurred due to plaintiff's failure to complete the contract.

### Factual Background

Plaintiff is a partnership organized and existing under the laws of the state of California. Defendant is the United States Forest Service, Region 5, Plumas National Forest, Greenville Ranger District. Third party plaintiff is a corporation duly organized and existing under the laws of the state of Pennsylvania and is authorized to engage in the business of suretyship and insurance in the state of California.

On November 8, 1981, defendant, the United States Forest Service, United States Department of Agriculture (Forest Service) advertised Canyondam Timber Sale Contract No. 051666 (Canyondam contract). The Canyondam contract involved the purchase and removal of timber from the Greenville Ranger District in the Plumas National Forest. The advertisement stated that the Forest Service would accept bids in the Office of the Forest Supervisor, Quincy, California, at 2:00 p.m., on December 21, 1981.

On the morning of December 21, 1981, the Forest Service learned that an accident blocked the primary highway leading to the designated bid site. Anticipating that the accident would prevent prospective bidders from participating in the sales auction, the Forest Service postponed the bid opening date for the Canyondam contract. The Forest Service thereupon notified prospective bidders by telephone that the bid opening was cancelled.[1] Nevertheless, several bidders, including plaintiff, Summit Contractors (Summit), arrived at the designated location and attempted to submit sealed bids for the Canyondam sale. The Forest Service did not accept these tendered bids and informed the bidders that the bid opening was rescheduled for January 7, 1982. On December 29, 1981, the Forest Service published notice to prospective bidders that bids for the Canyondam contract would be received by the Office of the Forest Supervisor at 2:00 p.m. on January 7, 1982.[2]

The Forest Service conducted bid opening on January 7, 1982. Summit was the apparent high bidder on the contract. Summit designated third party plaintiff, the Insurance Company of America (INA), as the performance bond surety for the Canyondam contract. INA issued a performance bond for the penal sum of $129,000.00 on February 19, 1982. Since Summit elected in its bid to have the Forest Service construct the necessary access roads for timber harvesting, the Forest Service delayed award for 120 days, as provided in the bid advertisement, to locate a satisfactory road construction contractor to perform the work. The contracting officer (CO) subsequently awarded Summit the Canyondam contract on March 18, 1982.

The Canyondam contract recited an estimated timber harvest volume of 6,990 thousand board feet (MBF)[3]. The timber sales

---

1. The record indicates that the Forest Service contacted six prospective bidders by telephone and advised them that bid opening has been postponed.

2. Both the original and revised bid dates for the Canyondam contract were advertised in the FEATHER RIVER BULLETIN, a local newspaper. Declaration of Joe Barratt, p. 6; third party plaintiff's motion, App. Ex. B, p. 39.

3. The Forest Service must estimate timber volume by species for each timber sale. The estimate is performed by Forest Service personnel designated as "certified cruisers." A "cruise" is a ground level sampling of selected areas or plots. The "cruisers" estimate the gross volume of timber, as well as timber defects and breakage, within those areas or plots. The sample results are then projected to the sale as a whole. The estimated volume is expressed in units of thousand board feet (MBF) or, alternatively, in terms of million board feet (MMBF). *Sierra Pacific Industries v. Block*, 643 F.Supp. 1256, 1260 (N.D.Cal.1986), *aff'd in part & rev'd in part*, *Sierra Pacific Industries v. Lyng*, 866 F.2d 1099 (9th Cir.1989).

The Forest Service originally marked and "cruised" the Canyondam Timber Sale in 1977

contract estimate is known as A2 volume.[4] The contract required the removal of all designated timber and completion of the sale by March 31, 1984.[5] The contract also specified that normal operating season for the timber harvesting was from June 1 through October 31 of each year.[6]

Following award, there was considerable confusion concerning the boundary of the sale area of the Canyondam contract. In the late summer of 1982, Mr. J.F. Denny, a general partner of Summit, contacted Forest Service Representative (FSR) Conrad Nussbaumer to voice his concerns about the Forest Service's marking of included timber.[7] After visiting the area in question, FSR Nussbaumer determined that the confusion was caused by other markings, made for previous projects, on the trees inside the sale area.[8] FSR Nussbaumer decided to apply fresh paint to all trees

designated for harvest under the contract. The Forest Service completed the paint refreshing on January 3, 1983.

Summit began harvesting timber under the contract on December 26, 1982. Logging operations fell behind schedule during the ensuing months. On February 7, 1982, FSR Nussbaumer suspended harvesting operations under the Canyondam contract upon belief that Summit was engaged in "species logging."[9] The Forest Service subsequently lifted the suspension order on February 22, 1983. Summit continued harvesting activities during the subsequent months, logging outside of the normal operating season set forth in the contract. By letter of June 3, 1983, FSR Nussbaumer notified Summit that it had 30 days inside the normal operating season to remedy the February 7, 1983, breach.[10] On July 8,

and 1978, as part of the Trough Timber Sale. The Trough Timber Sale was divided into the Trough, Alamanor, and Canyondam Timber Sales. As a result of this division, the Forest Service was required to perform additional marking and "cruising" to adjust the original estimated volumes for each timber sale. The Forest Service withdrew an estimated 600 MBF from the Canyondam Timber Sale prior to the sale advertisement. In addition, the Forest Service conducted four insect salvage timber sales which were partially within the Canyondam sale area. These timber sales resulted in the removal of 360 MBF from the Canyondam sale area. The Forest Service also eliminated 397 trees from the Canyondam sale for "visual resource management objectives."

4. The estimated volume of timber determined by the cruise and the standards to be used in determining timber merchantability are listed in provision A2 of the Canyondam contract. *Id.*

5. Canyondam contract provision B8.2 *Period of Contract.*

6. The normal operating season was specified in contract provision A20. The normal operating season is the period that a purchaser could expect to harvest timber and meet contract obligations and is dependant upon the normal weather conditions within the sales area. *Sierra Pacific Industries, supra.*

7. Under Canyondam contract clause C235# *Individual Trees* (12/75), timber included in the sale was to be marked by the Forest Service with orange paint.

8. In some cases, timber included in the Canyondam contract carried blue, white, or yellow

paint marks in addition to the orange paint marks stipulated in the contract. Apparently, some trees had chipped or partially removed markings. These markings were made for the four salvage timber sales, n. 3, *supra,* and one or more Christmas tree sales within the Canyondam sale area. Third party plaintiff's motion, App. Ex. B pp. 53–54.

9. "Species logging" is an impermissible timber harvesting practice by which a contractor leaves behind expensive species of timber and harvests less expensive species which can be sold at a greater profit on the market.

Canyondam contract provision B.6 *Control of Operations* requires that all harvesting operations be conducted in a workmanlike and orderly manner." The Forest Service maintained that the practice of "species logging" violated this provision. Contract provision B9.3 *Breach,* authorized the Forest Service to suspend all or part of Summit's logging operations upon the breach of a material provision of the contract. Consequently, the Forest Service issued Summit a written suspension of operations order for noncompliance with the terms of the Canyondam contract.

10. Canyondam contract provision B9.3 *Breach,* provides, in relevant part:

Upon receipt of oral or written notice of ... [a] breach, Purchaser shall remedy the breach as follows:
(a) If remedying such breach requires on-the-ground action by the Purchaser, Purchaser shall have 30 practicable working days during Normal Operating Season to do so, except under emergency conditions when action should not be delayed to prevent major damage.

1983, FSR Nussbaumer advised Summit by letter that the February 7, 1983, breach had not been remedied. Nussbaumer maintained that Summit was harvesting timber in unauthorized areas and could not continue this practice without written permission.

Summit informed the Forest Service on July 27, 1983, that it would not proceed with logging operations during the month of August 1983. Summit additionally stated that "[t]his will leave us with sufficient time to finish the sale within the limits of the contract." [11] Mr. Denny of Summit subsequently responded to the Forest Service's July 8 letter on August 31, 1983. In his letter, Mr. Denny averred that the timber marking for the Canyondam contract had been tampered with, and requested that the alleged tampering be remedied by remarking the sale area. In reply, FSR Nussbaumer stated that he found no evidence of tampering and, therefore, believed remarking to be unnecessary.

Summit obtained an independent cruise of the sale area during the summer of 1983. The cruise estimated the volume of the Canyondam timber sale to be 5864 MBF. Summit notified the Forest Service of the cruise, requested a reduction in the A2 estimate, and informally requested a contract extension. Both requests were denied by the Forest Service on October 5, 1983.

Summit also requested clarification of the bid date for the Canyondam timber sale.[12] Timber management officer (TMO) Joe Barratt sought an advance Forest Service ruling on this matter on October 26, 1983. By letter of December 2, 1983, Regional Director of Timber Management, Raymond Weinmann, stated that the Canyondam timber sale did not qualify for a 5–year contract extension under the Multi–Sale Extension Program (MSEP) because the sale took place on January 7, 1982, not December 21, 1981. The Forest Service related that the MSEP only applied to contracts bid after January 1, 1982. TMO Barratt forwarded this ruling to Summit on December 8, 1983.

Summit formally requested a contract extension by letter of March 27, 1984. Summit predicated entitlement to an extension on the Forest Service's alleged interference with its logging operations and Summit's alleged removal of more than 75 percent of the actual sale volume under the contract. Summit had cut and removed 4692.96 MBF of timber under the Canyondam contract. TMO Barratt, signing for the CO, denied Summit's request for a contract extension by letter of March 30, 1984. The CO maintained that the delay claimed by Summit was outside the normal operating season and therefore did not qualify for a contract term adjustment.[13] The CO also stated that Summit was not eligible for a contract term extension since less than 75 percent of the estimated volume of timber had been cut and removed from the sale

(b) If such breach does not require on-the-ground action by Purchaser, such breach shall be remedied within 30 calendar days.

11. Defendant's motion, App. p. 34.

12. The Canyondam contract bid date governs the availability of a 5–year extension under the Multi–Sale Extension Program (MSEP).

13. Under Canyondam contract provision B8.21, *Contract Term Adjustment*, a purchaser may qualify for a contract extension upon the occurrence of one of the following:

 (a) the Purchaser experiences delay beyond his control for 10 or more consecutive calendar days during the Normal Operating Season;

 (b) causes described in (a) substantially affect the disposition or processing of timber during the normal operating season;

 (c) the Purchaser accepts a Forest Service written request to interrupt or delay operations (other than suspension for noncompliance with the contract) or suffers a delay because of fire emergency, if the lost time totals 10 or more calendar days during the Normal Operating Season.

In addition, a purchaser's request for a contract term adjustment must be made "not more than 30 calendar days after the end of Normal Operating Season in which time was lost."

Summit stated in its March 27 letter that the Forest Service interrupted operations from February 3, 1983 through February 22, 1983. Summit also related that the Forest Service briefly shut down operations on January 13, 1983. Since Summit gave untimely notice of the delays and since both delays occurred outside the normal operating season (June 1—October 1), the contracting officer (CO) denied Summit's request for a term adjustment.

area.[14] The CO advised Summit that the Canyondam contract would expire on April 1, 1984, and that damages would be assessed against Summit in accordance with the terms of the contract. On April 6, 1984, the CO notified Summit that the Canyondam contract was terminated.

Summit protested termination of the Canyondam contract to the CO by letter of July 13, 1984. The CO considered Summit's communication to be a "claim" cognizable under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1982). Summit requested that the remaining timber under the Canyondam contract not be resold, that the contract be reinstated, and that Summit be granted either a one-year extension, pursuant to the terms of the contract, or a 5-year extension, under the MSEP, in order to complete the contract.

Following termination of the Canyondam contract, the Forest Service conducted a cruise of the sale area and determined that an estimated 1,370 MBF of timber remained under the defaulted contract. On July 23, 1984, prior to the CO's issuance of a final decision on Summit's claim, the Forest Service resold the remaining timber under the Canyondam contract.[15] The total volume cut and removed from the subject resale was 1,424 MBF. The CO rendered a final decision against Summit on October 19, 1984, determining that Summit was liable to the government in the amount of $358,712.16 for the failure to cut, remove, and pay for included timber on the Canyondam contract.[16]

Plaintiff filed a complaint in this court, challenging the CO's decision, on April 1, 1985. In its answer, defendant asserted a counterclaim for $345,476.12 for damages incurred due to plaintiff's failure to complete the Canyondam contract. Pursuant to the request of the parties, the court suspended proceedings in the case from October 9, 1985 to May 21, 1988, in order for the parties to engage in meaningful settlement negotiations.

After negotiations proved unsuccessful, defendant filed a motion to notify INA of the pending action.[17] Defendant served notice on third party INA on December 22, 1988. INA filed a third-party complaint with the court on January 30, 1989, incorporating by reference all of the allegations in plaintiff's complaint. Third party plaintiff additionally argued that its liability could not exceed $129,000.00, the penal sum of the performance bond. Defendant filed a motion for summary judgment on May 22, 1989. Third party plaintiff filed a response to defendant's motion together with a cross-motion for summary judgment on November 20, 1989. Plaintiff joined third party plaintiff's cross-motion on December 7, 1989.

### *Jurisdiction*

■ Plaintiff and third party plaintiff seek a determination that plaintiff was not in default of the Canyondam contract. Plaintiff and third party plaintiff assert no affirmative monetary claim against defendant, but contest defendant's assessment of damages under the terminated contract. Plaintiff and third party plaintiff essentially seek a declaratory judgment from this court that defendant's termination of the Canyondam contract was improper.

| | MBF | Cost or Value |
|---|---|---|
| Current contract value and uncut volume at termination date | 1370 | 582,649.70 |
| Cost of resale | — | 2,042.46 |
| Appraised value for resale | 1370 | 132,906.20 |
| Actual resale value | 1370 | 226,000.00 |
| Total amount of damages | — | 358,712.16 |

14. Summit conceded in its March 27 letter that it had cut and removed slightly less than 70 percent of the A2 estimate.

15. Contract provision B9.4, *Failure to Cut,* provides that in the event of a purchaser's breach of the contract, the Forest Service should appraise the remaining timber and conduct a resale of the contract. The government is entitled to damages equal to the difference beween the original contract price (plus cost of resale) and the resale price.

16. In his final decision, the CO provided the following calculation of damages:

17. Defendant previously made demand on third party plaintiff for the full penal sum on the performance bond after billing Summit for $358,712.16.

Prior to the passage of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–13 (1982), the Court of Claims, predecessor to this court, lacked jurisdiction to grant declaratory relief. Under its jurisdictional statute, the Tucker Act, 28 U.S.C. § 1491, the Court of Claims could only decide claims requesting monetary relief. Congress amended the Tucker Act in 1982 to give the Court jurisdiction over "any claim by or against, or dispute with, a contractor arising under the Contract Disputes Act." 28 U.S.C. § 1491(a)(2).

On occasion the court has relied on § 1491(a)(2) in asserting jurisdiction over claims that contest the propriety of a default termination but seek no specific monetary relief. *Claude E. Atkins Enters., Inc. v. United States*, 15 Cl.Ct. 644 (1988); *Russell Corp. v. United States*, 15 Cl.Ct. 760 (1988). Under the CDA, a contractor may only appeal a claim subject to dispute between the parties. There is divided case law on the issue of whether a CO termination for default constitutes a "dispute" as defined by the CDA. However, it has uniformly been held that contractor can invoke the court's direct access jurisdiction to challenge the validity of a default termination, even in the absence of a monetary claim, when the CO has expressed an intention to pursue specific contractual remedies against the defaulted contractor. *Gunn–Williams v. United States*, 8 Cl.Ct. 531 (1985); *see also Overall Roofing and Const. Inc. v. United States*, 20 Cl.Ct. 181 (1990); *SGW, Inc. v. United States*, 20 Cl.Ct. 174 (1990); *Crippen and Graen Corp. v. United States*, 18 Cl.Ct. 237 (1989).

In his final decision, the CO assessed damages against Summit for alleged default of the Canyondam contract. The government has additionally filed a counterclaim for these damages. The government has, therefore, clearly evinced an intention to pursue contractual remedies against Summit. Plaintiff and third party plaintiff contest defendant's entitlement to damages under the Canyondam contract. The court is thus presented with a claim involving a genuine contract "dispute" between the parties for purposes of the CDA. Since Summit has brought an action on the claim within 12 months of the CO's issuance of a final decision,[18] jurisdiction is proper under 41 U.S.C. § 607 (1982).

## Summary Judgment

Summary judgment is appropriate where the pleadings raise no genuine dispute as to any material fact and, as a matter of law, the moving party is entitled to judgment. RUSCC 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the nonmovant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing summary judgment has the burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

To grant summary judgment in the present case, the court must determine, as a matter of law, whether plaintiff was enti-

---

**18.** In his final decision, the CO stated that the Forest Service effectively denied Summit's claim on July 23, 1984, by reselling the remaining timber under the Canyondam contract. The court observes that the CO failed to issue a final decision, or notify Summit when a decision would be issued, within 60 days after receipt of the claim. Once this 60–day period had elapsed, the claim was "deemed denied" and Summit had the right to appeal under 41 U.S.C. § 605. However, the appeal period did not commence running until the CO issued a final decision on the claim on October 19, 1984. *Dawco Const. Inc. v. United States*, 12 Cl.Ct. 445 (1987). In any event, Summit's appeal was well within the 12–month appeal period set forth in 41 U.S.C. § 607.

tled to an extension of the Canyondam contract. The court is presented with questions of contract and statutory interpretation. The court may rule on those interpretations through summary judgment.[19] *McKart v. United States*, 395 U.S. 185, 198, 89 S.Ct. 1657, 1665, 23 L.Ed.2d 194 (1969).

## *Discussion*

### A. *Issues Presented*

The court must determine at the outset whether plaintiff was entitled to a contract extension, either pursuant to the terms of the Canyondam contract or under the MSEP. If the court finds that plaintiff was not so entitled, and that defendant's termination of the Canyondam contract was proper, then the court must decide whether third party plaintiff is additionally liable to defendant for interest on the performance bond issued under the contract.

### B. *Extension under the Canyondam contract*

Under the National Forest Management Timber Act of 1976, 16 U.S.C. § 472a (1982), the Forest Service is authorized to grant timber sale contract extensions subject to the following restrictions:

> The Secretary [of Agriculture] shall not extend any contract period with an original term of two years or more unless he finds (A) that the purchaser had diligently performed in accordance with an approved plan or operation or (B) that the substantial overriding public interest justifies the extension.

16 U.S.C. § 472a(c).

The Forest Service adopted regulations which echo this statutory mandate. *See* 36 C.F.R. § 223.115 (1990). Through Interim Directive 94, the Forest Service provided the following guidance, in relevant part, on what constitutes "diligent performance":

> *Sales Between July 1, 1978, and April 15, 1982.* Timber sale contracts for sales made on or after July 1, 1978, shall authorize contract term extensions only if the Purchaser has met the following conditions, unless the Chief finds that there is an overriding public that justifies the extension.
>
> \* \* \* \* \* \*
>
> b. At least 75 percent of the advertised volume has been cut and removed from the sale area.

Defendant's motion, App. p. 29.

Clause C8.231 incorporates Interim Directive 94 into the Canyondam contract, providing, in pertinent part:

> C8.231–CONDITIONS FOR CONTRACT TERM EXTENSIONS. (6/78) Forest Service may grant Purchaser's written request for Contract Term Extensions if all of the following conditions have been met by the Purchaser at time of Purchaser's request:
>
> \* \* \* \* \* \*
>
> b. At least 75 percent of the estimated volume in A2 has been cut and removed from the Sale Area.

Plaintiff and third party plaintiff contend that defendant improperly denied plaintiff an extension under clause C8.231 of the Canyondam contract. Plaintiff and third party plaintiff concede that plaintiff did not remove 75 percent of the A2 volume from the Canyondam sale area, but argue that the Forest Service knew its A2 estimate was inaccurate "based on data available to the Forest Service at the time of bidding, as well as based on Summit's consultant's cruise conducted during [the Canyondam] contract."[20]

---

19. The court overrules the Insurance Company of North America's (INA) objection to the admission of the declaration of Joe Barratt, all exhibits attached thereto, and all evidence offered by defendant in support of its motion for summary judgment. As a timber management officer, Mr. Barratt was responsible for the program management of all timber activities in the Plumas National Forest. In this capacity, Mr. Barratt had personal knowledge of the administration of the Canyondam contract. In addition, the documents upon which Mr. Barratt relies are admissible pursuant to Fed.R.Evid. 803(6) and 803(8). The court, therefore, admits defendant's evidence into the record.

20. Third party plaintiff's motion, p. 8.

INA and Summit maintain that the Forest Service should have modified the A2 estimate to adjust for timber removed by the government from the Canyondam sale area [21] and in light of an independent "cruise" performed by Summit in summer 1983, which purportedly suggested that the actual timber volume was considerably less than the A2 estimate. If defendant had properly taken this information into account, plaintiff and third party plaintiff argue, the Forest Service would have reduced the A2 volume estimate and Summit would have qualified for a contract extension under clause C8.231.[22] Plaintiff and third party plaintiff assert that Summit in fact cut and removed 75 percent of the *actual* volume under the Canyondam contract. INA and Summit, therefore, contend that defendant's use of the A2 estimate to defeat the requested time extension was substantially erroneous, a mistake of fact, or alternatively, an abuse of discretion.

■ A government timber volume estimate generally represents an "honest and informed conclusion" based on "all relevant information that is reasonably available." *Cedar Lumber, Inc. v. United States*, 5 Cl.Ct. 539, 545–46 (1984), quoting *Womack v. United States*, 182 Ct.Cl. 399, 412–13, 389 F.2d 793, 801 (1968). A timber contract estimate may convey a strict warranty of accuracy if the estimate forms the basis of the bargain between the parties, *Everett Plywood and Door Corp. v. United States*, 190 Ct.Cl. 80, 90–91, 419 F.2d 425, 430–31 (1969), or the estimate may alternatively create a warranty of "reasonable accuracy" under which "a purchaser acting prudently is entitled to rely but which permits some flexibility for error before it gives rise to a breach of contract." *Cedar Lumber, Inc.*, 5 Cl.Ct. at 546 [citations omitted]. Either warranty may be disclaimed by clear and unequivocal contract language or by a strong government warning to potential bidders to rely on their own information when calculating their bids, not the information contained in the government estimate. *Gregory Lumber, Co. v. United States*, 230 Ct.Cl. 1041, 1043 (1982); *Deal v. United States*, 3 Cl.Ct. 151 (1983). However, the government is not insulated from a breach of contract action by an otherwise unequivocal warranty disclaimer if the government estimate is grossly erroneous or negligently prepared. *Timber Investors Inc. v. United States*, 218 Ct.Cl. 408, 587 F.2d 472 (1978).

■ The Forest Service adequately disclaimed any warranty of accuracy created by the Canyondam contract A2 volume estimate. Canyondam contract provision B2.4 *Volume Estimate*, contains the following language:

> [T]he estimated volumes stated in A2 are not to be construed as guarantees or limitations of the timber volumes to be designed for cutting under the term of the contract.

The Canyondam bid prospectus also cautioned:

> This prospectus is to furnish sufficient information in additional [sic] to that contained in the published advertisement, to enable prospective bidders to decide whether further investigation of the sale is warranted.... Bidders are urged to examine the timber sale and make their

---

**21.** This timber was removed from the Canyondam sale because of insect infestation and due to a lack of a right-of-way.

**22.** Plaintiff and third party plaintiff aver that "calculations available to the Forest Service in December 1981, would logically suggest estimated volume for Canyondam to be approximately 6,040 MBF, not 6,990 MBF as listed [in the A2 estimate]." Third party plaintiff's motion, p. 7. Plaintiffs perform the following calculations to arrive at this conclusion:

1980 Environmental Analysis performed by the Forest Service 7000 MBF
less:

4 insect salvage sales partially or wholly within the Canyondam sale area 360 MBF

Further volume removed for lack of right of way and sold as part of the Almanor Timber Sale 600 MBF
Adjusted estimated volume 6040 MBF

Summit thus predicates qualification for a contract extension under clause C8.231 on removal of 77.7 percent (4692.96 MBF/6040 MBF) of the adjusted estimated volume.

own estimates. Estimated quantities in the contract are not guaranteed.... Sale area and sample contract should be inspected before submitting a bid.

For these reasons bidders are urged to examine the timber sale area and make their own recovery estimates.

Plaintiff's motion, App. Ex. B, pp. 41–42.

The Canyondam contract contains specific language which provided that the A2 volume estimate was not to be construed as a guarantee of timber volume. In addition, the bid prospectus clearly instructed Summit to inspect the Canyondam sale area to independently ascertain a reliable volume estimate. The court, therefore, finds that the Forest Service conveyed no warranty of timber volume under the Canyondam contract. *Deal v. United States*, 3 Cl.Ct. 151 (1983).

■ Plaintiffs contend that the inaccurate Forest Service A2 volume estimate constitutes a mutual mistake of fact justifying reformation of the Canyondam contract to reflect "an appropriate estimated volume."[23] A contractor cannot prevail under a mutual mistake theory if the contractor has assumed the risk of the mistake. The Court of Claims in *Flippin Materials Co. v. United States*, 160 Ct.Cl. 357, 368, 312 F.2d 408 (1963), noted that "a mutual mistake as to a fact or factor, even a material one, will not support relief if the contract puts the risk of such mistake on the party asking reformation." In the present case, the Forest Service, through the Canyondam contract and bid documents, instructed Summit not to rely on the A2 volume estimates set forth in the contract and, thus, shifted the risk of an erroneous estimate to the contractor. Since Summit has assumed the risk of a mistaken A2 volume estimate, INA and Summit are precluded from recovering under a theory of mutual mistake.

23. Third party plaintiff's motion, p. 14.

24. Summit cut and removed 4,692.96 MBF under the original Canyondam contract and Almanor Forest Products harvested 1,424.64 under the Canyondam resale contract.

■ INA and Summit further contend that the Forest Service committed "substantial error" by negligently calculating the A2 volume in the Canyondam contract. The actual timber volume under the Canyondam contract was 6,117.60 MBF,[24] approximately 873 MBF less than the A2 volume estimate of 6,990 MBF. This shortfall translates into a 12.5 percent variance between the Forest Service's A2 volume estimate and the actual volume of harvested timber. Standing alone, such a variance does not demonstrate government negligence or gross error. *See Caffall Bros. Forest Products, Inc., v. United States*, 230 Ct.Cl. 517, 678 F.2d 1071 (1982) (unexplained 25.4 percent variance between actual and estimated timber volumes did not establish government negligence, bad faith, or gross or unreasonable error). INA and Summit must, therefore, demonstrate that the 12.5 percent variance was due to Forest Service negligence. *Timber Investors, Inc.*, 218 Ct.Cl. 408, 587 F.2d 472, *supra*.

Plaintiffs fall short of proving that the Forest Service negligently calculated the Canyondam A2 volume. The record indicates that the Forest Service "cruised" the Canyondam sale area in 1977 and 1978. The Forest Service "recruised" and remarked the area shortly before the Canyondam sale. Based on this additional information, the Forest Service made further adjustments to the A2 volume estimate.[25] It is true that the Forest Service, in calculating the A2 volume, did not proportionally reduce the timber volume estimate to offset the timber salvage sales in the Canyondam sale area. However, the court notes that actual timber volume from these salvage sales exceeded volume estimates by nearly 100 percent.[26] The Forest Service, therefore, acted reasonably in not reducing the A2 volume since it had every right to believe that remaining portions would yield a higher timber volume than originally anticipated.

25. Defendant's motion, App. p. 5.

26. Defendant's motion, App. pp. 4–5.

Plaintiffs also point to the independent cruise performed by Summit after award of the Canyondam contract as evidence that the Forest Service was negligent. This "cruise" estimated the Canyondam timber volume to be 5,864 MBF, approximately 16 percent lower than the government estimate. The court notes that a "cruise" involves the sampling of 10 to 20 percent of a timber sales area and the extension of these results to the entire area. This undoubtedly creates a potential for distortion of the resulting "cruise" estimate, as well as a potential for disparate timber volume estimates of the same sales area when different sample areas are "cruised." In *Prineville Sawmill Co. v. United States*, 859 F.2d 905 (Fed.Cir.1988), the United States Court of Appeals for the Federal Circuit, relying on Forest Service guidelines,[27] concluded that a 19 percent difference between the Forest Service's first and second estimate of a timber sales area did not render the initial estimate grossly inaccurate. Given the margin of error associated with "cruise estimates", the court is unconvinced that the Forest Service, after utilizing all available information to calculate the A2 volume estimate, acted unreasonably in failing to modify the Canyondam contract upon being notified of an estimate 16 percent lower than that calculated by the government. After considering all evidence, the court finds that the Forest Service was not negligent in preparing the Canyondam A2 volume estimate or in failing to revise the A2 volume after the contract was awarded.

■ Plaintiff and third party plaintiff alternatively contend that the Forest Service's implementation of a 75 percent requirement for timber sale contract extensions is arbitrary, capricious, and an abuse of discretion. The Forest Service established the 75 percent requirement to be used as a factor in determining the "diligent performance" of a purchaser and to ascertain the overall likelihood that the

purchaser will complete the contract if extended. INA and Summit have failed to provide the court with any evidence suggesting the 75 percent requirement is an unreasonable figure by which to measure a contractor's "diligence." Rather, plaintiff and third party plaintiff contend that the Forest Service abused its discretion by seeking to "enforce the estimated volume in the face of a clear mistake".[28] The Forest Service was not aware that the A2 volume estimate was inaccurate until the Canyondam resale was completed. The court refuses to apply "20/20 hindsight" in reviewing the Forest Service's administration of the Canyondam contract. Based on the information available at the time Summit requested a contract extension, the court finds that the Forest Service did not abuse its discretion by denying Summit a contract extension.

■ In addition, the 75 percent requirement set forth in clause C8.231 is a prerequisite to a contract extension. Clause C8.231 states that the Forest Service *may* grant a contract extension once each condition of the clause is met. The clause therefore vests the Forest Service with discretion in granting a contractor's request for an extension. Assuming *arguendo* that the 75 percent requirement was met by plaintiff, Summit would merely qualify for, but not be entitled to, a contract extension. Therefore, even if the court reforms the Canyondam contract by reducing the A2 estimate, Summit cannot prevail in its motion for summary judgment.

■ The court finds that the Forest Service acted reasonably in not modifying the Canyondam contract A2 volume estimate. Since Summit failed to cut and remove 75 percent of the A2 volume, the Forest Service properly refused to grant Summit's request for a contract extension under clause C8.231. The court, therefore, holds that Summit was not entitled to an extension under the terms of the Canyondam contract.

---

**27.** The guidelines stated that 95 percent of all estimates were accurate to within 20 percent and 67 percent of all estimates were accurate to within 10 percent. The guidelines also stated

that variations of plus or minus 10 percent were common among timber estimates.

**28.** Third party plaintiff's motion, p. 20.

C. *Extension Under the Multi–Sale Extension Program (MSEP)*

■ Plaintiff and third party plaintiff contend that Summit was entitled to a contract extension under the Multi–Sale Extension Program (MSEP). The MSEP, ratified by the Federal Timber Contract Payment Modification Act (FTCPMA), 16 U.S.C. § 618 (1985), authorizes a 5–year extension for timber sales contracts "bid prior to January 1, 1982." 36 C.F.R. § 223.171 (1988). INA and Summit argue that the Canyondam contract was officially bid on December 21, 1981, since the Canyondam sale "was never formally or officially re-noticed" by the Forest Service. Defendant maintains that the January 7, 1982 bid opening was conducted in compliance with applicable Forest Service regulations and is, therefore, the controlling bid date for MSEP purposes.

■ Forest Service regulations require timber sales exceeding $10,000.00 to be advertised 30 days prior to bid opening. 36 C.F.R. § 223.80 (1988). The Forest Service originally scheduled bid opening on the Canyondam sale for December 21, 1981. The Forest Service advertised the Canyondam sale on November 18, 1981, more than 30 days in advance of the original bid date. On December 21, the Forest Service rescheduled bid opening for January 7, 1982, and published notice of "Continuation of National Forest Timber Sale Date" for the Canyondam sale on December 29, 1981. The Canyondam sale was consequently re-advertised 9 days prior to bid opening.

■ INA and Summit assert that Forest Service regulations required defendant to readvertise the Canyondam sale for an additional 30 days following the rescheduling of the bid date. The Forest Service regulations do not specifically address this issue. However, the Forest Service interpreted its regulations as not requiring re-advertisement of a rescheduled bid date of the same timber sale for an additional 30 days. The Forest Service's interpretation of its own regulations is accorded substantial deference and this court will overturn such an interpretation only if "plainly erroneous" or "inconsistent with the regula-

tion". *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

In conducting timber sales, the Forest Service must utilize bidding methods which "insure open and fair competition." 16 U.S.C. § 472a(e)(1)(A) (1985). The Forest Service established an advertising requirement to maximize competition in accordance with this statutory mandate by giving advance notice of the proposed sale to all interested parties. The Forest Service, therefore, perceived 30 days to be a reasonable period in which to notify a sufficient number of bidders and achieve "open and fair competition."

The Forest Service gave potential bidders adequate notice of the Canyondam sale by advertising 30 days prior the original bid date. The Forest Service postponed bid opening to afford existing bidders, otherwise prevented from participating in the Canyondam sale on December 21, 1981, an opportunity to compete for the contract. The Forest Service did not reschedule bid opening to provide more time to inform and attract potential bidders to the sale. Therefore, the purpose behind the 30 day advertisement period would conceivably not be served by applying the requirement to the rescheduled bid date. The court finds that the Forest Service reasonably concluded that the 30–day advertisement period (and the 9–day readvertisement period) generated adequate competition for the Canyondam contract and that an additional 30–day readvertisement was unnecessary. The court will therefore not disturb the Forest Service's decision that applicable regulations did not require a 30–day readvertisement period for the rescheduled bid opening.

The court concludes that the January 7, 1982, bid opening constitutes the official bid date of the Canyondam contract. The Forest Service accepted bids up to this date and did not conduct bid opening until the time designated in the December 29, 1981, sale advertisement. Since the Canyondam contract was not bid prior to January 1, 1982, the court holds that Summit did not

qualify for a five-year extension under the MSEP.[29]

Having determined that Summit was not entitled to a one-year contract extension or a 5-year contract extension under the Multi–Sale Extension Program, the court concludes that the Forest Service's termination of Summit for default of the Canyondam contract was proper.

## D. *Prejudgment Interest*

■ The Forest Service contends that INA is liable for prejudgment interest on the performance bond, and petitions the court to award interest from the date INA was first billed for Summit's failure to complete the Canyondam contract. INA contends that its liability is limited to $129,000.00, the face amount of the performance bond. INA maintains that no interest can accrue on the performance bond until INA becomes obligated to perform under the bond. INA asserts that its obligation to perform is contingent upon Summit's obligation to compensate the Forest Service for resale damages. INA states that Summit's obligation to pay, in turn, is suspended pending resolution of the dispute by this court. Therefore, INA reasons, no interest can accrue on the bond until this court determines the propriety of the Forest Service's termination of Summit under the Canyondam contract.

Courts have traditionally recognized the government's common law right to recover prejudgment interest on contract claims. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); *Billings v. United States*, 232 U.S. 261, 34 S.Ct. 421, 58 L.Ed. 596 (1914). The award of prejudgment interest is a matter of federal law which is committed to the sound discretion of the court.[30] In *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639, the Court stated:

The rule governing the interest to be recovered as damages for delayed payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damages expressed in terms of interest, for nonpayment of the amount found to be due.

479 U.S. at 309, 107 S.Ct. at 705.

The court must, therefore, weigh the equities of the case in determining whether prejudgment interest is necessary to adequately compensate the Forest Service for Summit's default of the Canyondam contract.

A performance bond surety is derivatively liable for a principal contractor's default of a contract. A performance surety's obligation under the bond therefore attaches upon the contractor's default. At that time, the performance surety generally has the option of paying the government's cost of completion or assuming performance under the contract. In light of this obligation, courts have assessed prejudgment interest against performance bond sureties. *United States v. American Mfg. Mut. Cas. Co.*, 901 F.2d 370 (4th Cir.1990). In *United States v. Seaboard Surety and The Home Insurance Co. v. Joseph Morton Co.*, 817 F.2d 956 (2d Cir.), *cert. denied*, 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 115 (1987), a district court awarded prejudgment interest on a defaulted contract against two performance bond sureties from the date the sureties denied liability under their bonds. The Second Circuit concluded that the lower court's calculation of prejudgment interest was an abuse of discretion, noting:

**29.** In addition, the court concludes that Summit is not entitled to a "buy-out" of the Canyondam contract. The "buy-out" program, like the MSEP, is limited to timber sale contracts bid prior to January 1, 1982. 16 U.S.C. § 618 (1985).

**30.** The court is unaware of any statute or regulation applicable in the present case. The court specifically notes that the Canyondam contract was executed prior to the effective date of the Debt Collection Act (DCA), 31 U.S.C. § 3717 (1984). Section 3717(g) states that the DCA coverage does not extend "to a claim under a contract executed before October 25, 1982, that is in effect on October 25, 1982."

From the government's perspective, it was harmed only insofar as it was forced to pay for completion that should have been financed by proceeds from the bond. Interest, therefore, cannot be assessed prior to the date the government began paying to complete the ... project. 817 F.2d at 965.

The Second Circuit, therefore, remanded the case for recalculation of prejudgment interest beginning no earlier than the date the government began funding the post-default completion of the contract.

INA executed a performance bond for the Canyondam contract, designating the government as the obligee and Summit as the principal under the bond. Upon Summit's default of the Canyondam contact, INA became derivatively liable to the Forest Service through the performance bond. In accord with *Seaboard Surety*, INA is, therefore, subject to prejudgment interest from the date defendant experienced a monetary loss occasioned by Summit's failure to complete the Canyondam contract. The fact that INA chose to contest the default termination of Summit should not toll the running of interest on defendant's claim. If INA had not disputed liability and paid the full bond amount, the government would have had the use of these funds and would have benefited from interest obtainable from this sum. Under the CDA, a contractor's submission of a "claim" commences the running of interest against the government. 41 U.S.C. § 611. The government should similarly be "made whole" by receiving the time value of money on successful claims. To hold otherwise would deny defendant compensation in present value terms for damages incurred and provide an incentive for similarly situated contractors and sureties to delay payment of claims through needless litigation.

 The assessment of prejudgment interest is compensatory, not penal. Prejudgment interest is awarded as reparation to a party "who has suffered actual monetary damages by another's breach" *Rodgers v. United States*, 332 U.S. 371, 373, 68

S.Ct. 5, 6, 92 L.Ed. 3 (1947). The Forest Service resold the Canyondam contract on July 23, 1984. Harvesting operations on the resale commenced in late August 1984, and were completed by the end of September 1984. By reselling the remaining timber under the Canyondam contract at a lower price, the Forest Service suffered a loss directly attributable to Summit's default. At the latest, this monetary loss became apparent upon completion of the resale. However, the Forest Service made no demand for payment of the damages incurred under the Canyondam contract until the CO rendered a final decision on October 19, 1984. On this date, the Forest Service notified Summit and INA that these damages in the amount of $358,-712.16 were due and payable within 15 days. Therefore, the court, in addition to finding INA liable for the full bond amount of $129,000.00, assesses prejudgment interest against INA, to be calculated from November 3, 1984—15 days from the date the government first demanded payment for damages resulting from Summit's default of the Canyondam contract. Further, the court assesses interest against Summit to commence from said date.

### Conclusion

For the foregoing reasons and pursuant to RUSCC 42(c), the court grants defendant's motion for summary judgment on its counterclaim and denies plaintiff's and third party plaintiff's cross-motion for summary judgment. The parties are directed to file, within 45 days, a joint stipulation as to the amount due defendant, plus interest, pursuant to provision B9.4 *Failure to Cut* of the Canyondam contract.[31] Interest due from Summit and INA on its performance bond is to be calculated at the rate specified by the Secretary of the Treasury in accordance with 31 U.S.C. § 3717(a)(1).

Accordingly, the Clerk is directed to enter judgment on defendant's counterclaim at that time without further order of the court. At said time, the Clerk is further instructed to dismiss plaintiff's complaint

---

**31.** The court notes that there is a discrepancy between the amount claimed by defendant in the CO's final decision and the amount asserted by defendant in its counterclaim.

and third party plaintiff's complaint. No costs.