ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| United Healthcare Partners, Inc. | )   ASBCA No. 58123 |
| | ) |
| Under Contract No. FA4877-12-C-0002 | ) |

APPEARANCE FOR THE APPELLANT:    Mr. David D. Cooper
                                              CEO

APPEARANCES FOR THE GOVERNMENT:    Col Matthew J. Mulbarger, USAF
                                            Air Force Chief Trial Attorney
                                            Michelle D. Coleman, Esq.
                                            Skye Mathieson, Esq.
                                            Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE PAGE
## ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

United Healthcare Partners, Inc. (UHP) appeals from the contracting officer's (CO's) final decision (COFD) to terminate for cause the parties' commercial items contract for telephone-based nurse triage answering services.[1] The parties filed cross-motions for summary judgment, and each relies upon multiple bases to justify its motion. The government alleges that termination was warranted by UHP's failure to perform in accordance with the contract, whereas UHP asserts that its actions are excused by the government's multiple material breaches of the contract. We deny each party's motion.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. The United States Air Force (AF or government) issued Contract No. FA4877-12-C-0002 to UHP on 1 October 2011 that included a base year and four optional years of performance (R4, tab 1). The single contract line item number (CLIN) 0001 required the contractor to "provide all facilities, equipment, tools, transportation, personnel, labor, supervision, and management to perform a 1-800 telephone-based Nurse Triage Answering Service on a 24/7 basis." This required the contractor to "provide clinical assessment and appropriate level of care support services for beneficiaries in the Davis-Monthan [Air Force Base, Arizona] [DMAFB] Catchment Area" from 1 October 2011 - 30 September 2012 for the base period. (*Id.* at 3)

---

[1] ASBCA No. 58123 is consolidated with ASBCA No. 59214, an appeal from a COFD denial of a claim for breach of contract damage, but the latter is not a subject of the cross-motions.

2. The solicitation advised that historical data for FY 10 indicates there were "19213" "Total Calls" during "Duty Hours" and "Non-Duty" hours (R4, tab 3 at 58). The terms "call(s)" and "all calls" are used throughout the contract (*see, e.g.*, CLIN 0001 and Performance Work Statement (PWS) ¶¶ 1.1.5, 1.1.6, 1.1.7, 1.1.8, 1.1.12 (R4, tab 1 at 3, 27-28)), and "Total Calls" is used in the solicitation (R4, tab 3 at 58). Neither document states whether the historical data or estimated quantity in CLIN 0001 includes "calls" that UHP is not allowed to charge to the government.

3. UHP's 15 September 2011 "Price Proposal" (R4, tab 3) complied with the solicitation requirement that prospective contractors' submissions be stated on a "price per call" basis (gov't mot., attach. D at 62). UHP's proposal stated the price of $12.90 per call (R4, tab 3 at 58).

4. According to CLIN 0001, the contract is for the acquisition of "SERVICES/SUPPLIES" described as "Nurse Triage Answering Service[s]." The CLIN states a quantity of "19,710"; defines the unit being purchased as "Calls"; states the unit price as "$12.90"; and the contract "AMOUNT" as "$254,259.00." On a separate line below the above information, and before a summary of the work to be performed in accordance with the PWS, is the acronym "FFP," which indicates that this is a "firm fixed-price" contract. (R4, tab 1 at 3)

5. The contract's "Performance Work Statement for Davis-Monthan Catchment Area Nurse Triage Services [DMCANTS]" for the "355th Medical Group (MDG)" (R4, tab 1 at 26) provided additional information regarding the anticipated telephone call volume:

> 1.1.16. **Estimated Monthly Call Volume**. The 355 MDG estimates that total monthly calls answered by the nurse triage service will be approximately 1,800-2,000. Approximately 5% of these calls will require paging the on-call Life Skills provider. The number of calls will vary based on the number of holidays and/or base down days for each month, and on seasonal flu/cold patterns.

(*Id.* at 30)

6. The contract contains standard Federal Acquisition Regulation (FAR) clauses that are incorporated by reference. These include FAR 52.232-1, PAYMENTS (APR 1984); FAR 52.233-1, DISPUTES (JUL 2002) – ALTERNATE 1 (DEC 1991); and FAR 52.246-4, INSPECTION OF SERVICES – FIXED-PRICE (AUG 1996) (R4, tab 1 at 7-8). The contract does not include, by reference or full text, either FAR 52.216-21, REQUIREMENTS or FAR 52.216-22, INDEFINITE QUANTITY (*id.* at 7-8).

2

7. The contract also contains two different standard clauses which authorize the government to terminate where the contractor fails to perform. In relevant part, FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984), incorporated by reference, provides in ¶¶ (a)(1) and (a)(1)(i) for termination where the contractor fails to "Deliver the supplies or to perform the services within the time specified in this contract or any extension" without a cure notice (52.249-8(a)(2)). (R4, tab 1 at 8)

8. The second clause allowing the government to terminate the contract is FAR 52.212-4, CONTRACT TERMS AND CONDITIONS–COMMERCIAL ITEMS (JUN 2010), which is incorporated by full text (R4, tab 1 at 8-12). In relevant part, ¶ (a) Inspection/Acceptance, states that the contractor "shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance." (*Id.* at 8) Paragraph (g) Invoice, ¶¶ (1)(iv) requires the contractor's invoice to include a "Description, quantity, unit of measure, unit price and extended price of the items delivered." Paragraph (i), Payment, provides at ¶ (1) that "Payment shall be made for items accepted by the Government." (*Id.* at 8-9) Paragraph (m), Termination for Cause, allows the government to "terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance." If the contract is terminated for cause, "the Government shall not be liable to the Contractor for any amount for...services not accepted.... If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience." (*Id.* at 11)

9. Contract clause FAR 52.212-4(d), Disputes, provides in relevant part that:

> This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1 Disputes, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(R4, tab 1 at 8)

10. The language of FAR 52.212-4(d) is consistent with contract provision FAR 52.233-1, DISPUTES (JUL 2002)—(ALTERNATE I), which was incorporated by reference. The latter clause states in ¶ (i) that "The Contractor shall proceed diligently

3

with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer." (R4, tab 1 at 7)

11. Contract clause FAR 52.246-4, INSPECTION OF SERVICES – FIXED-PRICE (AUG 1996) (R4, tab 1 at 7), is incorporated by reference and provides in relevant part:

> (e) If any of the services do not conform with contract requirements, the Government may require the Contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by reperformance, the Government may (1) require the Contractor to take necessary action to ensure that future performance conforms to contract requirements and (2) reduce the contract price to reflect the reduced value of the services performed.

> (f) If the Contractor fails to promptly perform the services again or take the necessary action to ensure future performance in conformity with contract requirements, the Government may (1) by contract or otherwise, perform the services and charge to the Contractor any cost incurred by the Government that is directly related to the performance of such services or (2) terminate the contract for default.

12. CLIN 0001 required UHP to perform in accordance with the PWS for DMCANTS for the 355th MDG (R4, tab 1 at 3). PWS ¶ 1.1.1, Background, describes DMCANTS as a "key entry point into the Military Health System." The PWS provided in relevant part:

> 1.0. **DESCRIPTION OF SERVICES/GENERAL INFORMATION**
>
> ....
>
> 1.1.2. **Scope**. The contractor shall provide a 1-800 telephone-based nurse triage service for the Davis-Monthan Catchment Area, to perform clinical assessment and appropriate level of care support services for the TRICARE program, 24 hours per day, 7 days a week, including all holidays. <u>All calls into the DMCANTS shall be answered by Registered Nurses [RNs], following nationally recognized and physician approved clinical</u>

4

protocols and guidelines for symptom-based calls. The contractor shall gather information from the nurse triage service calls and enter the information into a database to show assessments, documented resolution, and/or further action needed from a Primary Care Manager (PCM) or the Chief of the Medical Staff. The contractor shall e-mail or fax patient caller information to the TRICARE Operations and Patient Administration (TOPA) flight located at DMAFB. The contractor shall communicate DMCANTS activity with the TOPA Flight Commander daily. Items requiring necessary follow-up from the TOPA Flight Commander, PCM, or Chief of the Medical Staff will be identified by the contractor.

(*Id.* at 26) (Emphasis added)

13. PWS ¶ 1.1.5, Data Collection, provides that "[t]he contractor shall use a computer software program that will collect data that can collate calls by type of call received and information delivered. Every call shall be logged into the database and contain the following minimum information" that includes the date, time of call, patient name, sponsor's name, last 4 numbers of the sponsor's social security number, age, date of birth, address, telephone number, primary care physician/surgeon, current medications, allergies, pertinent surgical history, primary symptom/duration, nursing assessment, protocol used, disposition, reason for disposition, patient/caller understanding, patient/caller intended action, and nursing notes. (R4, tab 1 at 27) (Emphasis added)

14. Additional PWS requirements included the following:

1.1.6. **Telephone Response Time**. The contractor shall answer patient calls in real time, preferably in less than 5 minutes.

1.1.7. **Call Summaries**. The contractor shall provide comprehensive documentation of all calls, to include patient demographics, caller concern, primary symptom, protocol used, and disposition for each call. A summary of calls from the previous call period and each individual patient's triage documentation will be provided to the TOPA Flight Commander for distribution to the PCM team at the beginning of each duty day or to the Chief of the Medical Staff as requested. The contractor shall provide monthly comprehensive documentation of all calls taken to include patient demographics, caller concern, primary symptom, protocol used, and disposition for each call to

5

the Government Contracting Officer Representative (COR). This communication will be in a written format to facilitate follow-up with the referral management nurses and Military Treatment Facility (MTF) PCM teams as appropriate. The preferable method is via password protected e-mail to ensure <u>Health Insurance Portability and Accountability Act (HIPAA) protocols</u> are maintained.

1.1.8. **Call Statistics Reporting**. The contractor shall submit a monthly status report to the TOPA Flight Commander no later than the 10th working day of each month. <u>The monthly report shall include comprehensive analyses of all activity</u>.

....

1.1.9.1. **Quality Control Plan**. The contractor shall establish, implement, and maintain a Quality Control Plan to ensure all services are provided as specified in this contract.... The contractor shall submit the Quality Control Plan to the Contracting Officer upon contract award for review....

1.1.10. **General Enrollment Screening Protocols**. The contractor shall answer all patient calls with "355th Medical Group." The contractor shall first ask if the patient is an enrolled beneficiary of the 355 MDG at DMAFB. If the answer is "no", the contractor shall inform the patient that the service is only for enrolled beneficiaries, and advise the patient to call their PCM or TRICARE office in their assigned region....

....

1.1.14. **Other Support**. The contractor shall provide sufficient technical information and a valid phone number, so the 355 MDG appointment and information line will have a working link to the nurse triage service.

(R4, tab 1 at 27-29) (Emphasis added)

15. The government had responsibility for making follow-up calls to patients using information provided by the contractor that was obtained from incoming calls from enrolled beneficiaries (*see, e.g.*, R4, tab 1 at 26-27, 30, PWS ¶¶ 1.1.2, 1.1.7, 1.2.6).

16. PWS ¶ 2.0, Services Summary, set forth performance objectives, contract references, and performance thresholds for each objective. UHP was required to meet a "Performance Threshold" of "100%" for PWS ¶¶ 1.1.2, 1.1.3, 1.1.5.1, 1.1.6, 1.1.7, 1.1.8, 1.2.1.2, 1.2.4, 1.2.6. (R4, tab 1 at 31-32)

17. UHP was required to obtain "Protected Health Information" (PHI), which is defined as "information that was received from or created on behalf of" the enrolled beneficiaries of government's 355th MDG (R4, tab 1 at 44). The contractor was required to provide this PHI to the government in various periodic reports (*see, e.g., id.* at 26-31, especially PWS ¶¶ 1.1, 1.1.5, 1.1.7, 1.1.8). Because PHI is protected by HIPAA and other legal requirements, the contract required the parties to enter into a "Business Associate Agreement" that governed the contractor's handling of sensitive PHI and its provision of that information to the government (*id.* at 32, 44-48). This agreement at ¶ II.b. states that UHP must make the PHI "available to 355 MDG or a requesting individual" and at ¶¶ IV.b. and V.d. to disclose PHI to the government for data aggregation purposes (*id.* at 45-47). UHP furnished the government with an "executed" Business Associate Agreement on 1 October 2011. The agreement placed no limit upon the PHI which UHP was to furnish to the government. (R4, tab 6)

18. In several places the contract informed UHP that it was required to furnish nurse triage services only to enrolled beneficiaries of the 355th MDG in the DMAFB Catchment Area and to redirect other callers (*see, e.g.*, R4, tab 1 at 3, 26, 28, 30, CLIN 0001, PWS ¶¶ 1.1.1, 1.1.10). PWS ¶ 1.2.6, Hours of Operation, told UHP to provide services "24 hours per day, 7 days a week and on all holidays" and stated that "No gaps in contractor coverage of the nurse triage services are permissible." This provision also stated that "Non-triaged calls requesting 355 Medical Group or beneficiary information will not be charged to the MTF." (*Id.* at 30) Read together, these contract provisions inform UHP that it should expect to answer, but not triage, incoming calls from non-beneficiaries for which it would not be compensated (*id.* at 3, 26, 28, 30).

19. UHP does not dispute that it maintained two telephone lines from commercial provider Vonage in performing the contract (gov't mot., attachs. A and B). In accordance with PWS ¶ 1.1.14, Other Support (R4, tab 1 at 29), UHP received calls made directly to these lines and those transferred from the government's medical clinic main appointment line (gov't mot., attach. F, Decl. of TSGT Diana S. Habel, Group Practice Manager for the instant contract from 1 October 2011-6 February 2012 (Habel decl.) at 1). According to Vonage records, "David Cooper" obtained service for a local telephone number a toll-free number from 30 September 2011 until 29 February 2012 (gov't mot., attach. A at 2, attach. B). Although there were voluminous incoming calls to the local number (*id.*, attach. A, *passim*), only three calls are shown during this period to the toll-free number; none of the latter are from the government's medical clinic main appointment line (*id.*, attach. B at 4). Calls transferred from the government's medical clinic main appointment line show the incoming number as "restricted" (*id.*, attach. A, *passim*).

7

20. The government programmed UHP's local telephone number into an automatic call distributor system known as the "T-Metrics ACD system." The system allowed the government to track the number of incoming calls to this telephone number and to check the number of calls transferred from the government's clinic line to UHP's local telephone line. (Habel decl. at 1-2; *see also* R4, tabs 23, 34, 40 (printouts of the T-Metrics system showing transfers from the clinic to UHP's local telephone line)).

21. The contractor was required to submit monthly reports pertaining to its contract performance to the government. UHP's monthly report for "10/01/2011-10/31/2011" (R4, tab 15) provided the following categories and corresponding "Monthly Totals"; "Number of 355th Med Group Beneficiaries" (413); "Total Monthly Immediate UC [Urgent Care]/ER [Emergency Room]/Self Tx Guidance" (413); "Total PRP Members" (0); Total PRP Dependents (0); "Total non-PRP" (413); "TTL QM f/u/**Gen Q&A/**PT Ed Volume" (1,752); and "Total Patient Call Volume" (2,165) (*id.* at 102). According to the government, the term "non-PRP" denotes 355th MDG beneficiaries (gov't mot. at 13). UHP's October 2011 monthly report contains a summary of the "Daily Detailed Report" for each day of that month using the categories listed above and "Daily Totals" for each (R4, tab 15 at 103-11). The record does not disclose the nature of calls labeled by UHP as "TTL QM f/u/**Gen Q&A/**PT Ed Volume."

22. The government's first Corrective Action Report (CAR), No. 01-2011[2] advised UHP of unacceptable performance and gave a suspense date of 21 November 2011 to correct the deficiencies (R4, tab 14). CAR No. 01-2011 cited shortcomings with PWS ¶¶ 1.1.5, Data Collection and 1.1.7, Call Summaries (*id.* at 98). UHP was told that "Triage reports are only being sent on patients who were referred to Urgent Care or Emergency [and] these only accounts [sic] for 20% of total calls received." The government stated that "Patient information is incorrect on 50% of the Triage reports received; [sic] to the point that patients can't be identified." The government assessed the impacts of this deficient performance as a "High Patient Safety Risk" due to a "gap of continuity of care" and a "HIPAA Violation" because "incorrect patient information will lead to wrong information in patient record or inappropriate release." UHP was warned that "incorrect patient demographics will cause billing mistakes and patients receiving a bill when a referral should have been submitted." The contractor was told of "Patient dissatisfaction" because "Triage Nurses are not thorough and difficult to understand with extreme delay in follow-up/returned calls." (*Id.* at 99)

23. UHP on 22 November 2011 wrote the CO that it "intends to challenge [CAR No. 01-2011] and the premise(s) under which [it] was filed." The contractor characterized deficiencies cited in the CAR as "false and/or misleading." UHP contended that it understood that the parties had "collectively reached an agreement" that certain patient data called for by PWS ¶ 1.1.5 "violates law, regulations or public safety." (R4, tab 20

---

[2] The date of issue of CAR 01-2011 is not in the record.

at 121)  The record does not contain, nor does UHP allege, that it further challenged or responded to CAR No. 01-2011.  The declarations of Gary Douglas Kimmel, Chief of Base Acquisition Flight for Contracting, and David R. Harrison, CO, deny that the parties reached such an agreement.

24.  The government on 23 November 2011 issued a "Show Cause" notice to UHP, and advised the contractor that "the Government considers your failure to maintain the standards outlined in the [PWS] in the aforementioned contract unacceptable."  The notice warned that "unless this condition is addressed within 14 calendar days after receipt of this notice," the government "may terminate for default" under "contract clause 52.249-8 'Default (Fixed-Price Supply and Service).'"  Specific concerns were stated as UHP's failures to respond to the CAR of 14 November 2011; meet performance standards under PWS ¶ 1.1.5; and "provide Data Collection IAW contract terms and conditions" which "placed patients in an unsafe situation."  (R4, tab 21)

25.  On 25 November 2011, the government paid UHP's invoice for $27,928.50 for services rendered during October 2011 (R4, tab 11).

26.  The government continued to contest UHP's reported call volumes for want of documentation and UHP continued to deny that the contract required this level of detailed information to support its invoices.  UHP's revised Monthly Report for 1-30 November 2011 (R4, tab 22) stated that the contractor handled 451 calls from 355th Medical Group beneficiaries plus 1,423 calls from callers identified only as "TTL QM f/u/**Gen Q&A/**PT Ed Volume" for a "Total Patient Call Volume" of 1,874 (*id.* at 137).  The revised report carries the "NOTE" that "Invoicing information is derived from automated telecommunication systems daily count and is NOT linked to Patient Database[s] or medically categorized Patient Volume Statistic[s]" (*id.*).

27.  The government issued a second CAR to UHP on 2 December 2011 (R4, tab 24).  Similar to the first CAR (R4, tab 14), CAR No. 02-2011 referenced PWS ¶¶ 1.1.5 and 1.1.7; specified the contractor's alleged "UNACCEPTABLE PERFORMANCE" and resulting adverse impacts; and again questioned whether UHP was billing for calls that were not compensable under the contract (R4, tab 24 at 212-13).  UHP was provided a summary of errors in its reported data (*id.* at 215-220), and given a suspense date of 8 December 2011 to respond (*id.* at 212).  The government issued a third CAR, No. 03-2011, on 7 December 2011 and required UHP to respond to the cited deficiencies by 14 December 2011 (R4, tab 27).  The government issued a fourth CAR, No. 04-2011, on 12 December 2011 and gave UHP until 19 December 2011 to respond (R4, tab 28).

28.  UHP was issued a fifth CAR, No. 05-2011, on 14 December 2011.  The government cited PWS ¶¶ 1.1.2 and 1.1.6 as contract requirements that were not being met; specified the contractor's performance shortcomings and adverse impacts to

9

patients; and summarized problems with appellant's data. Additional issues raised in this CAR were that "Patient calls are being answered by a machine system vs. an RN as stated in [PWS ¶] 1.1.2" and thus "are not received in real time [as required by PWS ¶] 1.1.6." The government contended that patients were experiencing unacceptably lengthy delays and failures to have calls returned, and gave UHP until 20 December 2011 to respond. (R4, tab 31)

29. On 22 December 2011, the government issued a sixth CAR, No. 06-2011, and gave UHP until 29 December 2011 to respond to the deficiencies cited therein. The government cited PWS ¶¶ 1.1.2, 1.1.6 and 1.1.7 as of concern and reiterated UHP's performance shortcomings and associated negative patient impacts. Additionally, the government noted that UHP was providing only the last four digits of a patient's social security number, which made it difficult to identify the person. (R4, tab 31)

30. The record does not show, nor does appellant assert, that UHP responded to the government's CARs after the first one (R4, *passim*; app. mot. and opp'n, *passim*).

31. Between 16 November and 23 December 2011, the government repeatedly sought UHP's assistance in identifying certain patients after the government was unable to do so due to incorrect or insufficient data in the contractor's reports. UHP variously attributed the errors to the patient, the government, or to mistakes in its reports. (R4, tabs 16-19, 25-26, 30, 32)

32. UHP's monthly report for 1-31 December 2011 reported a "Total Patient Call Volume" of 1,928 calls (R4, tab 33). This included 571 calls received from "355th Med Group Beneficiaries" and 1,357 calls labeled "TTL QM f/u/**Gen Q&A/PT Ed Volume" (*id*. at 247).

33. In a 17 January 2012 email, the government told UHP that it was "holding up acceptance of [the contractor's] invoice's [sic] for Nov and Dec pending verification of call volume." The government asked the contractor for the "rational[e] for the disparity between the government's reported call volume and your company's reported call volume" so the "invoices [could be] processed for payment as soon as possible." (R4, tab 35) On 26 January 2012, the government rejected UHP's December 2011 invoice, citing discrepancies between call volumes asserted and those documented (R4, tab 37).

34. The contractor's 31 January 2012 response criticized the government's reasons for rejecting UHP's invoices (R4, tab 38). UHP stated that "the submission of the Monthly Clinical Statistics Report is NOT stipulated to, as a contingency to invoice approval in the [PWS] or in the Contract language, nor is it (typically) a true and accurate representation for accounting and invoicing purposes" (*id*. at 291). UHP advised:

> At this juncture, and given the apparently deliberate and
> creative efforts to suspend compensation to our Firm,

utilizing procedures outside the prescribed parameters and guidelines under FAR and DCMA for Suspension and Notification of payment for Professional Contracted Services, our Firm is unable to continue to provide services to [DMAFB] should the suspension of payment not be rectified by Close of Business February 3, 2012. Should this not be possible, our Firm will have no other recourse but to suspend or cancel services as of that time, as a result of actions and inaction taken by your Administration, placing our Firm in an untenable fiscal position.

(*Id.* at 292)

35. The government on 1 February 2012 notified UHP that its "response did not provide any facts or figures which would allow us to remedy the discrepancy in call volume generated by your company and government records." Among other things, the government requested that appellant provide the data required by the PWS. UHP was told that its "monthly status report does not capture the minimum information required by the contract." This left the government unable "to verify the call numbers you are submitting as accurate since the reports do not provide comprehensive documentation." The CO cautioned UHP that its threat to cancel or suspend services unless it was paid by 3 February 2012 could make the contractor liable for costs including reprocurement. (R4, tab 41)

36. On 2 February 2012, the government issued CAR No. 01-2012, based on the contractor's failure to comply with PWS ¶¶ 1.1.5, 1.1.6, 1.1.7, 1.1.8, 1.[1].9, and 1.2.5 and required UHP to respond by 9 February 2012 (R4, tab 42). On 2 February 2012, appellant replied that "The Contract does not stipulate to ANY specific requirement for accounting verification or justification purposes with exception to" using the government's automated Wide Area Workflow invoicing system "as an accounting representation for billing and compensation." UHP reasserted that due to the government's continued "suspension of compensation to our Firm for Triage Services rendered, now (3) three month[s] to date, we have no option but to suspend all services to Davis-Monthan Air Force Base immediately and until it can be determined, if a resolution can be reached." (R4, tab 43) (Emphasis added)

37. UHP's monthly report for 1-31 January 2012 (R4, tab 39) stated that it had responded to a total of 1,753 calls, which included 610 calls from "355th Med Group Beneficiaries" and 1,143 calls from "TTL QM f/u/**Gen Q&A/**PT Ed Volume" (*id.* at 293). On 7 February 2012, the government rejected UHP's invoice dated 6 February 2012 for work claimed for January 2012 because it was unable to verify the call volume asserted by the contractor (R4, tab 47).

11

38. The DMAFB contracting office notified Ms. Habel on 2 February 2012 that UHP had discontinued service, and she received complaints that the government's clinic appointment line clerks were unable to transfer callers seeking nurse triage services to UHP's number. Ms. Habel at 3:56 p.m. that day called the clinic's appointment line from her work number; after her call was transferred to UHP's triage line, the phone rang twice then beeped continuously until she hung up. She tried to access appellant's nurse triage services line from her cell phone at 5:46 p.m. but was again unsuccessful. Upon verifying that UHP's phone line was not operable, Ms. Habel put in place a contingency plan for government nurses to furnish patient services until a reprocurement contractor could take UHP's place. (Habel decl. at 3-4)

39. The CO prepared an undated "DETERMINATION AND FINDINGS" recounting factors considered in "determin[ing] whether to terminate [UHP's] contract for cause in accordance with FAR 49-402-3(f)." The CO concluded that "it is in the best interest of the Government to terminate this contract for cause (default)." The CO stated that UHP "has not [met] performance standards identified within [PWS ¶¶] 1.1.2, 1.1.5, 1.1.6, 1.1.7, 1.1.8, and 1.1.9" and detailed appellant's performance deficiencies. The government also noted that, other than "their single email of 22 Nov 2011," the contractor has failed to respond to the CARs. The CO said that nurse triage services were "mission essential" and "a 24/7 requirement [that] does not lend itself to any break in service." (R4, tab 36) The CO's 3 February 2012 memorandum for record focused upon UHP's repeated assertions that it would cease performance unless paid. He stated that "Faced with the disruption of services, the [355th MDG] put a contingency plan in place to have [government staff] man the Nurse Triage line" after UHP's telephone lines became inoperative. (R4, tab 45)

40. The COFD of 6 February 2012, entitled "NOTICE OF TERMINATION FOR CAUSE" (R4, tab 46), notified UHP that the subject contract was terminated in accordance with "contract clause 52.249-8 [Default (Fixed-Price Supply and Service]." The CO cited UHP's "failure to maintain the standards" set forth in PWS ¶¶ "1.1.2, 1.1.5, 1.1.6[,] 1.1.7, 1.1.8, and 1.1.9." (*Id.* at 361)

## DECISION

I. *Standards for Summary Judgment*

Summary judgment is an efficient measure for resolving suits in which there are no disputed material facts and the movant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); FED. R. CIV. P. 56. "A movant for successful summary judgment must show, based solely upon the record now before us and without benefit of a hearing that there is sufficient and uncontroverted evidence to meet its evidentiary obligation as defined by law and precedent." *Osborne Construction Co.*, ASBCA No. 55030, 09-1 BCA ¶ 34,083 at 168,512. "Summary judgment is appropriate when, drawing all reasonable

12

inferences in favor of the nonmovant, there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Spectrum Pharmaceuticals, Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1333 (Fed. Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). While "we determine whether disputed facts are present, the Board will not at this juncture serve as arbiters to resolve controversies nor weigh evidence or make determinations of credibility." *Osborne*, 09-1 BCA ¶ 34,083 at 168,513 (citing *Liberty Lobby*, 477 U.S. at 248).

Although both parties move for summary judgment and assert there are no disputed material facts regarding their respective legal positions, they interpret the contract and events differently. "Merely because a party has moved for summary judgment and avers there are no genuine issues of fact precluding its recovery does not mean that it 'concede[s] that no issues remain in the event [that its] adversary's theory is adopted.'" We evaluate each cross-motion "separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other.'" *Osborne*, 09-1 BCA ¶ 34,083 at 168,513 (quoting *Mingus*, 812 F.2d at 1391).

"Substantive law dictates the parties' relative burdens, and defines those 'material' facts that may affect the outcome of a particular cause of action." *Osborne*, 09-1 BCA ¶ 34,083 at 168,512 (citing *Liberty Lobby*, 477 U.S. at 249-50). As this appeal is grounded in an allegedly wrongful contract termination, substantive law governing terminations controls. A termination for default is a drastic sanction that should be imposed "only for good grounds and on solid evidence." *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969). The government bears the burden of proving that the termination was justified, "regardless of whose 'claim' is being asserted." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). If the government establishes a prima facie case of the contractor's default, then the contractor must show that the default was excusable within the meaning of the Default clause or was caused by the government's material breach. *Military Aircraft Parts*, ASBCA No. 59978, 15-1 BCA ¶ 36,101 at 176,258.

II.    *Controlling Contract Termination Provision*

As a preliminary matter, we note that this firm-fixed-price, commercial items contract contains two clauses that permit the government to terminate for default or cause (SOF ¶ 7). These are FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE (APR 1984); and FAR 52.212-4, CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (JUN 2010)[3] (SOF ¶¶ 7-8). FAR 52.249-8(a)(1)(i) states that the government may "terminate this contract in whole or in part if the Contractor" fails to "perform the

---

[3] The Board's decision in *SWR, Inc.*, ASBCA No. 56708, 15-1 BCA ¶ 35,832, provides a thorough historic perspective of federal procurement of Commercial Items.

13

services within the time specified in this contract," and at ¶ (a)(2) that the government should provide the contractor with a 10-day opportunity to cure. FAR 52.212-4(m) authorizes the government to terminate the contract "for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance." The latter clause does not require that the government give the contractor advance notice or opportunity to cure. *See, e.g., Gargoyles, Inc.*, ASBCA No. 57515, 13 BCA ¶ 35,330.

According to the government's 6 February 2012 COFD, the contract was terminated in accordance with FAR 52.249-8 due to UHP's failure to maintain the standards required by the PWS, specifically ¶¶ 1.1.2, 1.1.5, 1.1.6, 1.1.7, 1.1.8, and 1.1.9. (SOF ¶ 40). However, the subject line of the COFD states that it is a "NOTICE OF TERMINATION FOR CAUSE," language that is consistent with FAR 52.212-4(m) and not FAR 52.249-8, which focuses upon the term "default."

The Board has addressed the confusion that may result from the government's insertion of both FAR 52.249-8 and FAR 52.212-4 in a commercial items contract. It is appropriate to determine which provision controls, as commercial items contracts are unique in government contracting. The "principles that apply under the FAR clauses that govern termination for default apply with equal force under the termination for cause provision of the commercial items clause." *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719 at 170,952 (citing *General Injectables & Vaccines, Inc.*, ASBCA No. 54930, 06-2 BCA ¶ 33,401 at 165,593, *aff'd*, 519 F.3d 1360 (Fed. Cir. 2006), *reh'g denied*, 527 F.3d 1375 (Fed. Cir. 2008)). According to FAR 12.403, Termination, ¶ (a):

> [T]he paragraphs in 52.212-4 entitled "Termination for the Government's Convenience" and "Termination for Cause" contain concepts which differ from those contained in the termination clauses prescribed in Part 49. Consequently, the requirements of Part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section. Contracting officers may continue to use Part 49 as guidance to the extent that Part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4.

Thus, "based upon the provisions of paragraph (m) of FAR 52.212-4, the government has the right to terminate for cause in the event of 'any default' by appellant, or upon appellant's failure 'to comply with any contract terms and conditions,' or upon appellant's failure to 'provide…adequate assurances of future performance.'" *Gargoyles*, 13 BCA ¶ 35,330 at 173,412. We find that FAR 52.212-4 ¶ (m) is the controlling termination clause in the instant contract.

14

III.    *The Parties' Motions for Summary Judgment*

The parties' divergent perspectives are reflected in the bases asserted to justify the motions (gov't mot. and app. mot.) and are repeated in the oppositions (gov't opp'n and app. opp'n) and the government's reply to appellant's opposition (gov't reply). For purposes of judicial economy, we consider all relevant submissions in analyzing the parties' positions on specific issues.

A.    *The Government's Motion for Summary Judgment*

The government advances three principal arguments in support of its motion, two of which are cited in the government's 6 February 2011 Notice of Termination for Cause, which relied upon FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984) as authority for the CO's action. First, UHP anticipatorily repudiated the contract through unequivocal statements on 31 January and 2 February 2012 that it would cease performance immediately and indefinitely unless promptly paid. Second, UHP then allegedly materially breached the contract when, rather than correcting performance deficits noted in the CARs or continuing services while disputing the issues in accordance with the contract's Disputes clause, the contractor abandoned performance on 2 February 2012 by rendering inoperable the telephone lines used for nurse triage services. (Gov't mot. at 23-24)

The government urges a third basis to substantiate the termination, which was not explicitly stated in the termination notice. It argues that UHP's discontinuing services violated PWS ¶¶ 1.1.2 and 1.2.6, which required that the contractor provide nurse triage services "24 hours per day, 7 days a week, including all holidays." (Gov't mot. at 35) The government asserts that UHP also "failed to meet the 100% performance threshold for [PWS ¶] 1.1.7" to "provide call summaries for *all calls*" (*id.* at 36). It says that while "UHP only provided daily reports for calls referred to Urgent Care or Emergency," the contractor "also had an obligation under the contract to provide documentation for *all calls* meaning all 355th MG beneficiary calls requiring clinical assessment." The government asserts that UHP's failure "to meet even one of the 100% performance thresholds" stated in PWS ¶ 2.0 "is a material breach of the PWS and thus justified termination" even though this deficiency was not "explicitly cite[d]" in the COFD. (*Id.* at 37)

1.    *Alleged Anticipatory Repudiation of the Contract by UHP*

FAR 52.212-4(m) allows the government to terminate the contract for cause where, among other things, the "Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon written request, with adequate assurances of future performance." The government bears the initial burden of proving that its termination of a commercial items contract for cause is justified under the standard set forth in this clause. *Dace Enterprises, LLC*, ASBCA No. 57984, 13 BCA ¶ 35,451

at 173,846 (citing *Genome-Communications*, ASBCA Nos. 57267, 57285, 11-1 BCA ¶ 34,699 at 170,889). Deciding whether a contractor anticipatorily repudiated the contract is "a legal determination susceptible to summary judgment if there are undisputed facts supporting a positive, definite, unconditional and unequivocal intention to repudiate." *Vinyl Technology, Inc.*, ASBCA No. 47967, 97-1 BCA ¶ 28,974 at 144,298 (citing *Scott Aviation*, ASBCA No. 40776, 91-3 BCA ¶ 24,123 at 120,726). Used "[i]n this context, 'unconditional' means without imposing a condition the opposing party has no duty to perform." *Vinyl Technology*, 97-1 BCA ¶ 28,974 at 144,298 (citing *Amexicana Corp.*, ASBCA No. 14417, 71-1 BCA ¶ 8886 at 41,301, *aff'd on recon.*, 71-2 BCA ¶ 8990).

We find that undisputed material facts establish that UHP anticipatorily repudiated the contract by unequivocally communicating on 31 January and 2 February 2012 that it intended to stop work unless the government paid its invoices by 3 February 2012. The government had refused to pay the invoices because it believed that UHP had not complied with the contract and had failed to document "all calls" for which it invoiced the government. (SOF ¶¶ 22-24, 26-29, 31, 33-36) The government was within its rights to refuse to pay the contractor where it regarded the work as unacceptably performed. A contractor is generally required to continue performance as directed by the government, pending resolution of the parties' dispute. "If the contractor believes the [government's] interpretation erroneous, the determination may be appealed through the claims procedure." *Essex Electro Engineers, Inc.*, ASBCA No. 49915, 02-1 BCA ¶ 31,714 at 156,699. In short, "Government contractors must perform and then argue about the amount of the equitable adjustment at some later time." *Benju Corp.*, ASBCA No. 43648 *et al.*, 97-2 BCA ¶ 29,274 at 145,655 (quoting S. Rep. No. 95-1118, 95th Cong., 2d Sess. 32, *reprinted in* 1978 U.S.C.C.A.N. 5235, 5266).

When the government responded to UHP on 1 February 2012 and reminded appellant of its contractual obligations, UHP gave no assurances that it would continue while disputing the government's refusal to pay invoices. Instead, the contractor said that, due to the government's continued "suspension of compensation to our Firm for Triage Services rendered, now (3) three month[s] to date, we have no option but to suspend all services to [DMAFB] immediately and until it can be determined, if a resolution can be reached." (SOF ¶¶ 35, 36). UHP's declaration of intent to cease performance justified the CO's decision to terminate the contract for cause on the basis of anticipatory repudiation. "[I]n order for a default termination to be sustained, the CO need only be found to have been 'justifiably insecure about the contract's timely completion.'" *Free & Ben*, 11-1 BCA ¶ 34,719 at 170,954 (citing *FFR-Bauelemente + Bausanierung GmbH*, ASBCA No. 52152 *et al.*, 07-2 BCA ¶ 33,627 at 166,557). The anticipatory repudiation of a contract is not limited to "cases of express and unequivocal repudiation of a contract." Rather, a contractor's anticipatory repudiation may be found where "reasonable grounds" support the belief that the other party "will breach the contract," and a "demand [for] adequate assurance of due performance" is not met. *Danzig v. AEC Corp.*, 224 F.3d 1333, 1337-38 (Fed. Cir. 2000), *cert. denied*, 532 U.S. 995 (2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 251 (1981)).

16

We are not persuaded by UHP's intimation (as we understand it) that it demonstrated forbearance in the face of the government's refusal to pay its invoices, or that it only said that it would "suspend" performance until the payment issue was resolved, presumably in its favor (*see, e.g.*, app. opp'n at 12; app. mot. at 44-45). UHP's use of the word "suspend" does not weaken the government's position that appellant anticipatorily repudiated the contract, which requires the contractor to provide health-related nurse triage services on a "24/7" basis, without lapse. We find that the government has established a prima facie basis for terminating the contract for cause following UHP's anticipatory repudiation, and in § III.B address whether UHP has shown this action was excused by the government's material breach.

### 2. *UHP's Alleged Material Breach of Contract by Abandonment of Performance*

The government next moves for summary judgment on the basis that UHP materially breached the contract by abandoning performance (gov't mot. at 31-35). The government has met its burden of proof by demonstrating undisputed material facts that appellant prematurely and without government assent ceased to provide agreed-upon nurse triage services. Appellant's withdrawal of telephone access violated multiple contract provisions. These included CLIN 0001, which required UHP to perform a "Nurse Triage Answering Service on a 24/7 basis" during the base period of 1 October 2011-30 September 2012. The PWS contains several provisions which consistently reinforced CLIN 0001; *see, e.g.*, PWS ¶¶ 1.1.2, 1.1.6, 1.14, 1.2.6, and PWS ¶ 2.0, which set a 100% performance threshold with respect to PWS ¶¶ 1.1.2 and 1.2.6 and other requirements. Taken together, these emphasize UHP's duty to provide prompt and uninterrupted nurse triage services by means of a valid telephone number on a "24/7" basis during the period specified in the contract. (SOF ¶¶ 1, 4, 14, 16, 28)

The government has met its initial burden of proof by showing that appellant refused to continue performance, and has established a prima facie basis for terminating for cause. *See, e.g., General Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir. 2008) and *Precision Standard, Inc.*, ASBCA No. 59116, 15-1 BCA ¶ 36,040 at 176,028. We find that uncontroverted facts establish that UHP repudiated the contract by abruptly ending performance on 2 February 2012 when the government did not acquiesce to appellant's demands that its invoices be paid by 3 February 2012 (SOF ¶¶ 34, 38). This is sufficient to meet the government's dual burdens of justifying termination of the contract for cause, and showing undisputed material facts supporting summary judgment. We consider in § III.B whether UHP's repudiation may be excused.

UHP challenges the government's termination of the contract as procedurally flawed. It contends that the government "failed to execute 'Cure' procedural requirements" (app. mot. at 14), and denies that the government's "show cause" notice and CARs were an adequate substitute for a 10-day cure notice (*id.* at 57). It is

17

unnecessary that we determine whether the "show cause" notice and CARs were an adequate substitute for a cure notice, as none is required for a commercial items contract. We have determined in § II that the correct authority for the termination is FAR 52.212-4(m), and this provision does not necessitate a cure notice.[4]

> Pursuant to FAR 12.403(a), the requirements of FAR part 49 do not apply when terminating contracts for commercial items. However, COs may use FAR part 49 as guidance to the extent that its provisions do not conflict with FAR 12.403 and the provisions of FAR 52.212-4. We have held that the principles governing termination for default also apply to terminations for cause.

*Gargoyles,* 13 BCA ¶ 35,330 at 173,412 (citing *Genome-Communications,* 11-1 BCA ¶ 34,699 at 170,889) (footnote omitted). In accordance with FAR 52.212-4(m), "the government has the right to terminate for cause in the event of 'any default' by appellant, or upon appellant's failure 'to comply with any contract terms and conditions,' or upon appellant's failure to 'provide…adequate assurances of future performance.'" *Gargoyles,* 13 BCA ¶ 35,330 at 173,412.

### 3. *UHP's Alleged Failure to Meet the Contract's 100% Performance Threshold for Documenting All Billable Calls Justified the Termination for Cause*

The government captions its third argument for summary judgment as "UHP's Failure to Meet the Contract's 100% Performance Threshold for Documenting 'All' Billable Calls Justified the Termination for Cause" (gov't mot. at 35). It asserts that, even though this position was not articulated in the COFD, it is a legitimate basis for termination (*id.* at 38). The government argues that UHP failed to provide a daily summary and a monthly summary for "all calls" as required by PWS ¶ 1.1.7. It criticizes UHP on two grounds: first, that appellant did not provide documentation for "all" of the calls included in its invoice (gov't mot. at 36); we evaluate this assertion in § III.B.1. The second ground goes beyond this alleged deficiency, and extends to both the number and the content of the reports that UHP did provide.

---

[4] Even if FAR 52.249-8 Default (Fixed-Price Supply and Service) were the correct clause, the result would be the same. This clause also "permits a termination for default without a cure notice…in the event that the contractor 'fails to…perform the services within the time specified'" in the contract. *Greenleaf Distribution Services, Inc.,* ASBCA No. 34300, 88-3 BCA ¶ 21,001 at 106,100-01. Similar to *Greenleaf,* it was unnecessary for the government to provide UHP a cure notice as doing so may have effectively eliminated important services for an extended period. *Id.*

18

The government says that PWS ¶ 1.1.7 should be read in conjunction with PWS ¶ 1.1.5 Data Collection, "which required UHP to collect 22 points of data for all of its calls." PWS ¶ 1.1.7 "required two summaries, a daily summary and a monthly summary" that "had to have 'comprehensive documentation of *all calls*, to include patient demographics, caller concern, primary symptom, protocol used, and disposition for each call,' which is essentially the same data as the 22 data points required" by PWS ¶ 1.1.5. The government says that UHP had to provide a "summary of calls and each individual's patient triage documentation" to "the TOPA Flight Commander at the beginning of each duty day, which meant that UHP had to provide comprehensive documentation of all of the calls it serviced each day." The contractor also had to provide the CO's representative with "monthly comprehensive documentation of all calls taken to include patient demographics, caller concern, primary symptom, protocol used, and disposition for each call." (Gov't mot. at 36)

According to the government, while "UHP only provided daily reports for calls referred to Urgent Care or Emergency," the contractor "had an obligation under the contract to provide documentation for *all calls* meaning all 355th MG beneficiary calls requiring clinical assessment" (gov't mot. at 37). In the government's view, UHP was to provide services "intended to assist with triaging non-life threatening situations and directing the appropriate level of care to resolve the medical issue," and had to document these calls in accordance with the contract (gov't opp'n at 36). While it does not disagree with UHP's assertion that it was not appropriate to obtain patient data from emergency callers, the government's rationale is founded in its contract interpretation and not in the law or medical protocols. It reasons that patient data is not required because callers with emergencies would "not fall under the compensable calls under the contract, *i.e.*, calls requiring clinical assessment." (*Id.*)

The government mentions another category of calls included in UHP's invoices, which the contractor labeled as "TTL QM f/u/**Gen Q&A/**PT Ed Volume." It asserts that, to the extent that UHP believed that these calls were compensable, it should have provided "documentation [that] would have assisted the Air Force in inspecting the calls and determining whether they were acceptable under the contract.... Instead, UHP simply provided a daily and monthly summary of the number of calls that it said that it serviced" under various categories. (Gov't mot. at 37)

The government cites its contractual authority to inspect services as a condition to accepting the work and making payment to the contractor. It alleges that appellant's failure to provide patient data from calls invoiced "did not permit the Air Force to inspect or accept UHP's services." It says that the contractor's refusal to "provide the comprehensive documentation required under" PWS ¶ 1.1.7 fell short of the "100% performance threshold requirement under the contract," and was "a material breach of the PWS and thus justified termination." (Gov't mot. at 37) The government denies "commit[ting] a material breach" by "ask[ing] UHP to substantiate its invoices before

19

payment," and takes exception to UHP's belief "that because it serviced calls that it should be paid for those calls without any validation" (*id.* at 45).

UHP's disputes the government's version of facts, and responds that it gave the government both the required reports and, as appropriate, the data called for by the contract. Appellant says that the "substantiation to the new level of details" demanded by the government "is an excessive and unnecessary inspection and contrary to FFP guidelines for simplified accounting and compensation." (App. opp'n at 13) According to UHP, the government's unreasonable interpretation of the contract renders the 100% performance threshold unattainable (*id.* at 6). Appellant says that it followed PWS ¶ 1.1.7 and "provided daily Triage medical record reports…for Patients requiring and/or requesting Triage medical evaluations" as well as "a monthly report containing the comprehensive documentation of all calls by the 10th working day of each month" (app. mot. at 46). The contractor asserts that the government was not responsive to its repeated requests to resolve this issue (app. opp'n at 3, 13-14).

The contractor asserts that collecting and providing all of the patient information required by the government was "unenforceable and prohibitive," as doing so would violate "laws and regulations" applicable to its medical professionals. Appellant alleges that documenting "the 22 items of Patient information of 'every call' and caller" in accordance with PWS ¶ "1.1.5 constitutes a violation of Public and Patient Privacy and Safety under HIPAA." The requirement that UHP document "'all calls'…also violates the authority and jurisdiction of the Contract Office and Officers, as it related to Non-355th members and Non DMAFB personnel." (App. opp'n at 11-12) UHP contends that it was prevented by HIPAA from providing PHI to government contract administrators, who "do not fall within the parameters of a Healthcare Provider or ancillary covered entities" (*id.* at 11). Appellant denies that it repudiated the contract, and characterizes the government's "refusal to address violations of Law created by [the government's] interpretation of the contract language" and its "failure to provide instructions and direction" as "an unequivocal and definite repudiation" by the government (*id.* at 11-12).

Although the government did not rely upon this argument in terminating the contract, it is permitted to raise it on motion as we "may uphold a termination for default on any ground existing at the time of the termination." *Kaman Precision Products, Inc.*, ASBCA Nos. 56305, 56313, 10-2 BCA ¶ 34,529 at 170,286. We have considered the parties' arguments regarding UHP's compliance with the 100% performance threshold set forth in PWS ¶ 2.0, and find that both parties fall short of justifying summary judgment. The government's argument goes to two aspects of reports that appellant was supposed to provide: whether it provided the correct number of reports, and whether each report contained the requisite content. Without more specific proof, the government failed to show that undisputed material facts support its argument that UHP did not document "all calls" in accordance with

20

PWS ¶ 1.1.7. The government has not met its heavy burden to justify terminating UHP's contract for cause on this basis without benefit of an evidentiary hearing.

Similarly, UHP failed to adequately support its motion by fact or by law; it has neither established that it provided all reports required by contract or that any missing content was appropriately excluded. Appellant has not established that its refusal to collect or report particular data was excused by law or applicable medical protocol, and does not explain the effect of the Business Associate Agreement entered into by the parties that governed the handling of PHI and its disclosure to the government (*see* SOF ¶ 17). We cannot on motion assess whether the government materially breached the contract by the manner in which it interpreted the contract. Nor can we assess from the record before us whether UHP reasonably interpreted the contract to preclude collecting and distributing certain information due to conflicts with outside medical protocols and laws, or whether compliance with these comprised a contractual ambiguity. Among other things, that would require that we evaluate extrinsic evidence which is not now before us and presents a mixed question of fact and law unsuitable for summary judgment. *See, e.g., MIC/CCS, Joint Venture*, ASCBA No. 58023, 14-1 BCA ¶ 35,678 at 174,636. Triable issues remain regarding whether UHP provided all required information on all calls for which it billed the government, and whether it has been compensated for calls properly performed in accordance with the contract.

### B. *UHP's Motion for Summary Judgment*

The government established a prima facie case for terminating the contract for cause on the bases of UHP's anticipatory repudiation of the contract and abandonment of performance. The burden of production now shifts to UHP to show that its actions are excusable, or were caused by the government's material breach. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996), *cert. denied*, 519 U.S. 992 (1996). Appellant maintains that it attempted to resolve the "Government's misinterpretation of the contract language, which resulted in compromise to adherence and compliance to laws, regulations and safe Patient Practices." UHP says that the government refused to go beyond preliminary discussions, then "refused to address any aspect of the existing or additional issues of violation or language correction." (App. opp'n at 3)

UHP's motion alleges over twenty instances of the government's material breach of contract to excuse appellant's prematurely ending the work and its alleged performance deficiencies (*see, e.g.*, app. mot. at 10-11, 59). These allegations underpin two central arguments.[5] The first is that the parties entered into a lump sum, firm-fixed-price contract in the amount of $254,259 with payment to be apportioned on a monthly basis independent

---

[5] We have discussed appellant's other primary contentions that the government materially breached the contract by failing to issue a cure notice in § II.A.2 and wrongly withheld payment after requiring call documentation in violation of law and medial protocol in § III.A.3.

21

of the number of calls (app. mot. at 35-36, 56; *see also* app. opp'n at 13-16), and that the government wrongly refused to pay for work performed (app. mot. at 25-28). The second argument is that the government negligently estimated the number of anticipated calls in the solicitation and contract (*id.* at 20-22).

In order to recover on a breach of contract theory, appellant must show by a preponderance of the evidence that the government owed appellant a contract duty; the government breached that duty and caused damage to appellant; and the damage was reasonably foreseeable at the time of contract award. *Edinburgh International*, ASBCA No. 58864, 16-1 BCA ¶ 36,227 at 176,743 (citing *TRS Research*, ASBCA No. 51712, 01-1 BCA ¶ 31,149 at 153,874; and *M.A. Mortenson Co.*, ASBCA No. 53105 *et al.*, 04-2 BCA ¶ 32,713 at 161,845).

   1. *The Government's Alleged Material Breach of Failing to Pay UHP on a Lump Sum Basis*

UHP alleges that the government materially breached the contract by erroneously tying contractor payments to call volume (app. mot. at 56-58; app. opp'n at 6-7, 13-14). The contractor maintains that "the Air Force unreasonably required UHP to invoice the government on a monthly basis based on the number of actual calls," whereas "payments under firm-fixed-price contracts are not tied to an actual call volume [but] are based solely on the fixed amount provided for in the contract" (app. mot. at 56).

UHP contends that "the contract and the SF 1499 compensation agreement was designated and designed to be a Firm-Fixed-Price 'lump sum' agreement 'not subject to any adjustment' of compensation amount" (app. opp'n at 13). It argues that "the contract is a firm-fixed-price contract that provides for a payment to UHP in the amount of $254,259.00 a year, or $21,188.25 per month, regardless of whether UHP received 1,500, 2,000, or 2,500 calls in a given month" (app. mot. at 56). UHP says that the government materially changed the lump sum contract by going to "a 'per call' reimbursement contract type" (app. opp'n at 12-13). Appellant argues that the "volume serviced under a Firm-Fixed-Price contract is not relevant to the payment amount, therefore, substantiation to the new level of details" demanded by the government "is an excessive and unnecessary inspection and contrary to FFP guidelines for simplified accounting and compensation" (*id.* at 13). To the extent that volume is relevant, appellant contends that the government's use of the automated T-Metrics system to track calls received by the contractor was flawed, as this did not record calls made to UHP's direct line (*id.* at 4). UHP cited its prior course of dealing in successfully providing nurse triage services under other government contracts, asserting that its compensation "had never been tied to actual call volume" in "nearly 10 years of doing business...under such firm-fixed-price contracts." (*Id.* at 15)

The government agrees with appellant that this is a fixed-price contract, but disagrees that it is in a lump sum amount (gov't opp'n at 20). Rather, it asserts that "UHP was to be paid a fixed price of $12.90 per unit or calls that it made in accordance with the contract" (*id.* at 7). The government maintains that "UHP's contract is a 'price per call' fixed-unit-price contract, not a firm-fixed-price lump sum contract" in which "payment was based upon the number of calls that UHP serviced in accordance with the contract requirements" (gov't mot. at 40). According to the government, it is not a material breach of contract to withhold payment for cause where appellant did not comply with contract requirements to document the calls (gov't opp'n at 44).

Both parties' arguments rely upon language in CLIN 0001, which describes the "SERVICES/SUPPLIES" being procured as "Nurse Triage Answering Service[s]" (*see, e.g.,* app. mot. at 56-58; gov't opp'n at 7, 19). The quantity is given as "19,710"; the unit as "Calls"; the unit price is stated as "$12.90" and the "AMOUNT" as "$254,259.00." On a separate line below the above information and before a summary of the work to be performed in accordance with the PWS, is the acronym "FFP," which indicates that this is a "firm fixed-price" contract. (SOF ¶ 4)

The Board resolves contract interpretation disputes by considering the document as a whole, harmonizing and giving reasonable meaning to all provisions if possible. *NVT Technologies, Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004). We find no contractual support for appellant's argument that this was a "lump sum" contract, nor does appellant effectively counter the fact that CLIN 0001 is stated in the unit price of $12.90 "per call." Instead, UHP relies on past experience under other fixed-price contracts in which it furnished the government with nurse triage services, none of which have been shown to be relevant or contain language similar to that used here. Appellant failed to prove that the government materially breached the contract by failing to pay UHP on a lump sum basis, irrespective of call volume. We deny summary judgment on this basis.

2. *The Government's Alleged Material Breach of the Contract by Negligently Estimating the Number of Calls*

UHP alleges that the government materially breached the contract by negligently estimating the number of anticipated calls that the contractor should expect as its workload. Appellant asserts that it relied to its detriment upon the projected call volume of 19,710 as stated in the solicitation and contract. It maintains that neither of these documents contains an exclusion as to the type of call, nor did these indicate that any of the calls included in the government-provided estimate would be non-compensable. (App. mot. at 20-24) UHP again references CLIN 0001, which as previously noted states a "quantity" of 19,710 and the "unit" as "calls" (SOF ¶ 4). Appellant urges that this was a "Misrepresentation during the formation of the contract" (app. mot. at 31), and that under the government's erroneous interpretation of

23

the contract "approximately 70-80% of the total calls [it actually received] would be uncompensated" (*id*. at 21).

The government denies negligently estimating the anticipated number of calls in the solicitation and contract. It asserts that if UHP "argue[s] that it understood the entire 19,710 call volume to represent compensated calls," then this "assum[es] that the calls received that were not to be charged to the contract under the PWS were *in addition to* the disclosed call volume of 19,710, rather than included in the 19,710 call volume." The government argues that this would constitute "a patent ambiguity evident on the face of the solicitation provisions, which imposed on UHP the duty to inquire." (Gov't opp'n at 31-32) The government questions the number of compensable versus non-compensable calls that appellant claims it received, based upon the relatively small number of call summaries submitted by the contractor (*id*. at 33-34). It contends that UHP was told in PWS ¶ 1.2.6 that "[n]on-triaged calls requesting 355 Medical Group or beneficiary information will not be charged to the [government]" (gov't opp'n at 25 (citing R4, tab 1 at 30)), nor would "patient follow-up calls" that were to be performed by the government pursuant to PWS ¶ 1.1.2 (gov't opp'n at 26).

The government's estimate of supplies or services to be purchased is of significance for several varieties of government contracts, "as the quantity may impact both a contractor's capacity to supply the contract items and the price at which it agrees to supply them." *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328, 1334-35 (Fed. Cir. 2003). Even though an estimate is not a guaranteed level of work, the government is required to use care in estimating contract workloads, as the contractor is entitled to rely upon this information in preparing its bid or proposal. The government will be found liable where a contractor can show by a preponderance of evidence that the estimate was prepared in an inadequate or negligent manner, was not done in good faith, or was "grossly or unreasonably inadequate at the time the estimate was made." *Medart, Inc. v. Austin*, 967 F.2d 579, 581 (Fed. Cir. 1992). To prevail on its claim that the government materially breached the contract by negligently estimating the anticipated workload, UHP "must show '(a) misrepresentation in the Government proffered estimates, whether intentional or negligent, (b) reliance thereon, and (c) resulting injury.'" *American General Trading & Contracting WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,638 (citing *J.A. Jones Mgmt. Services, Inc.*, ASBCA No. 46793, 99-1 BCA ¶ 30,303 at 149,833). "The adequacy of the government's estimate is only tested by the relevant information reasonably available to it." *American General Trading*, 12-1 BCA ¶ 34,905 at 171,635 (citing *Womack v. United States*, 389 F.2d 793, 801 (Ct. Cl. 1968)). Although a "negligent estimate as to a material matter is a breach of contract," our next step is to ascertain the type of contract at issue, as "not all types of contracts are subject to such claims." *American General Trading & Contracting*, ASBCA No. 56758, 14-1 BCA ¶ 35,587 at 174,378.

Federal procurement regulations direct the CO to include provisions in the solicitation and contract that identify the contract type and specify the nature of the

parties' relative obligations. The FAR has specific clauses that must be included in a contract, depending upon the government's purchasing obligations. According to FAR 16.501-2(a), "There are three types of indefinite-delivery contracts: Definite-quantity contracts, requirements contracts, and indefinite-quantity contracts." A definite-quantity contract sets forth with precision the amount of goods or services the government will obtain within a fixed period. *See* FAR 16.502, Definite-quantity contracts. The instant contract does not stipulate a definite number of calls UHP is to handle, and thus is an indefinite-quantity contract. A negligently-prepared estimate does not give rise to a contractor's cause of action in a definite-quantity contract, as the government is obliged to procure a set amount of services or supplies. FAR 16.506(e) requires the government to insert FAR 52.216-22, Indefinite Quantity into those contracts defined in FAR 16.504 as for an unquantified amount, but does not obligate the government to obtain all of its requirements from that vendor. According to FAR 16.504(a)(1), such a "contract must require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services," which according to ¶ (a)(2) "must be more than a nominal quantity." The government will not be held liable for a negligent estimate in an indefinite-quantity contract, which guarantees only that the government will order at least a specified minimum quantity; any further ordering is at the discretion of the government. This minimum is an essential element, as otherwise the contract would lack sufficient detail to be enforceable and fail for want of consideration. *Eastern New Mexico University – Roswell*, ASBCA No. 57110, 12-2 BCA ¶ 35,090 at 172,337 (citing *Mason v. United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl. 1980); and *Maintenance Engineers, Inc. v. United States*, 749 F.2d 724, 726 (Fed. Cir. 1984)).

FAR 16.506, Solicitation provisions and contract clauses, at ¶ (d)(1) requires the government to include FAR 52.216-21, Requirements, in those contracts which oblige the government to exclusively obtain the unquantified amount of "all" of its particular needs from the contractor within a fixed period. The government may be liable for a negligent estimate in a requirements-type contract, as bidders are entitled to rely upon a reasonable projection of anticipated work. *See, e.g., American General Trading*, 12-1 BCA ¶ 34,905 at 171,635-36.

There are other types of government contracts, not applicable here, that are also susceptible to breach claims when the government negligently estimates the anticipated quantity. There is no breach for a negligent estimate where the government includes a "clear and unequivocal" statement or other strong language that sufficiently tells prospective bidders to perform their own investigation, and warns that the government's estimate is not to be relied upon. *See, e.g., Summit Contractors v. United States*, 21 Cl. Ct. 767, 776 (1990). Even then, such disclaimers may be overridden and the government found liable if the "estimate is grossly erroneous or negligently prepared." *Id.* (citing *Timber Investors, Inc. v. United States*, 587 F.2d 472 (Ct. Ct. 1978)). In any event, the contract with UHP does not contain a disclaimer regarding the estimate.

25

Contract interpretation begins with examination of the plain language of the written agreement. *LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009). Contract terms are interpreted and read as a whole, giving reasonable meaning to all of its parts; where possible, we do so in a manner that does not leave "a portion of the contract useless, inexplicable, void or superfluous." *NVT Technologies*, 370 F.3d at 1159. "Pure contract interpretation is a question of law which may be resolved by summary judgment. Determination of the type of contract the parties entered into is generally a matter of law." *Eastern New Mexico Univ.*, 12-2 BCA ¶ 35,090 at 172,336 (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984); *Textron Defense Sys. v. Widnall*, 143 F.3d 1465, 1468 (Fed. Cir. 1998); and *Maintenance Engineers, Inc. v. United States*, 749 F.2d 724, 73 n.3 (Fed. Cir. 1984)). Neither UHP nor the government have sufficiently addressed this point in making and opposing these motions. The contract does not contain either FAR 52.216-21 Requirements or FAR 52.216-22 Indefinite Quantity as called for by FAR 16.506. While this suggests that the contract was neither, further briefing is needed on this highly relevant point.

However, for purposes of deciding UHP's motion, we adopt the approach taken in *American General Trading*, 12-1 BCA ¶ 34,905 at 171,636, and continue our analysis of UHP's motion. "Without deciding upon the nature of the contract, for purposes of ruling upon the parties' cross-motions we give the benefit of the doubt to" the contractor "that the contract is one that is subject to a breach claim based upon negligent estimates." *Id.* We assume *arguendo* that a negligent estimate could be a material breach of its contract, and examine UHP's contentions in support of its motion. UHP cites *Tzell Airtrak Travel Group Corp.*, ASBCA No. 57313, 11-2 BCA ¶ 34,845, in arguing that a material misrepresentation of compensable calls would excuse its repudiation of the contract (app. mot. at 21-22). The Board held there that: "A contract is voidable if a party's manifestation of assent was induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient was justified in relying." *Tzell*, 11-2 BCA ¶ 34,845 at 171,409-10 (citing RESTATEMENT (SECOND) OF CONTRACTS § 164 (1981); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1381 (Fed. Cir. 2004); *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed. Cir. 1997); *see also Morris v. United States*, 33 Fed. Cl. 733, 745 (1995)).

Analyzing UHP's contentions that the government negligently estimated the anticipated workload discloses that the contract lacks terms required by the FAR to define contract type. Should the contract lack sufficient terms to be enforceable, then it is voidable. *Tzell*, 11-2 BCA ¶ 35,845. There is also the question of what the government intended to include in its estimate, and further amplification is needed as to contractual terms and UHP's reliance on the approximated workload. "Although contract interpretation is generally considered a legal question susceptible to summary judgment, there are situations in which it requires the resolution of factual issues." *Kaman Precision*, 10-2 BCA ¶ 34,529 at 170,286. That is the case here; further

investigation is required, as the record is not sufficiently developed to warrant summary judgment on this point.

## CONCLUSION

Neither party has established undisputed material facts to fully support its motion for summary judgment, despite each having put forth multiple theories. The government made a prima facie case that UHP threatened to end and then untimely ceased performance. However, we are required to construe disputed material facts in favor of the non-movant, and UHP demonstrated that there are triable issues regarding the repudiation and abandonment that preclude judgment for the government. UHP further raised factual and legal issues that require further development of the record with respect to whether the government is liable for negligently estimating the workload. Also, the contract's seeming lack of salient terms raises the question of whether the parties had an unenforceable contract that would allow UHP to withdraw from the agreement without giving rise to liability for repudiation. Further, triable issues also remain regarding whether UHP has been fully compensated for work properly performed under the contract.

We have considered but find it unnecessary to more fully address the remaining arguments advanced by the parties, none of which merit summary judgment for its proponent. Many of those advanced by appellant center upon the government's alleged breach of the duty to cooperate, arising primarily from the parties' disagreements over the issues addressed in this decision, and it is unnecessary to analyze these in further detail. Nor has UHP met its burden of establishing by undisputed material facts that the government acted in bad faith. "In alleging bad faith by the government, appellant must carry a high burden to overcome the government's presumption of having acted in good faith. To carry this 'high burden,' requires a showing by clear and convincing evidence that a contracting officer acted with the specific intent to injure appellant." *SAI Construction, Inc.*, ASBCA No. 57693, 14-1 BCA ¶ 35,762 at 174,987 (citing *Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012); and *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002)).

Despite its prima facie showing, the government has not established by "good grounds and on solid evidence" that it justifiably terminated the contract for cause because questions remain on whether this was an enforceable contract. *See, e.g., Lisbon Contractors*, 828 F.2d at 765; *J.D. Hedin*, 408 F.2d at 431; *see also Tzell*, 11-2 BCA ¶ 34,845 at 171,409-10. UHP has not established, as it must to obtain judgment, by undisputed material facts that the government materially breached the contract. *See, e.g., Mingus*, 812 F.2d at 1390.

27

## CONCLUSION

The parties' cross-motions for summary judgment are denied.

Dated: 17 May 2016

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58123, Appeal of United Healthcare Partners, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

28